WILLIAM ROMANO, RAYMOND G. AKERSTEN, DONALD HAND, LAWRENCE O'BRIEN, BRUCE DECHER, JOSEPH AMATO, AND RICHARD STROPOLI, PLAINTIFFS-APPELLANTS, v. IRWIN I. KIMMELMAN, IN HIS OFFICIAL CAPACITY AS THE ATTORNEY GENERAL OF THE STATE OF NEW JERSEY, CLINTON PAGANO, IN HIS OFFICIAL CAPACITY AS COLONEL OF THE NEW JERSEY STATE POLICE AND THE STATE OF NEW JERSEY, DEFENDANTS-RESPONDENTS.

STATE OF NEW JERSEY (BY MONMOUTH BEACH BOROUGH), PLAINTIFF-RESPONDENT, v. WILLIAM ROMANO, DEFENDANT-APPELLANT.

STATE OF NEW JERSEY (BY WALL TOWNSHIP), PLAINTIFF-RESPONDENT, v. DONALD HAND, DEFENDANT-APPELLANT.

STATE OF NEW JERSEY (BY MIDDLETOWN TOWNSHIP), PLAINTIFF-RESPONDENT, v. RAYMOND G. AKERSTEN, DEFENDANT-APPELLANT.

STATE OF NEW JERSEY (BY HOLMDEL TOWNSHIP), PLAINTIFF-RESPONDENT, v. LAWRENCE O'BRIEN, DEFENDANT-APPELLANT.

STATE OF NEW JERSEY (BY MANASQUAN BOROUGH), PLAINTIFF-RESPONDENT, v. RICHARD STROPOLI, DEFENDANT-APPELLANT.

STATE OF NEW JERSEY (BY HOWELL TOWNSHIP), PLAINTIFF-RESPONDENT, v. BRUCE DECHER, DEFENDANT-APPELLANT.

STATE OF NEW JERSEY (BY HAZLET TOWNSHIP), PLAINTIFF-RESPONDENT, v. JOSEPH AMATO, DEFENDANT-APPELLANT.

Argued November 29, 1983—Decision Rendered March 26, 1984— Opinion April 19, 1984.

*Francis X. Moore* and *John J. McDermott* argued the cause for appellants (*Francis X. Moore* and *Thomas J. Smith,* attorneys).

*Boris Moczula,* Deputy Attorney General, argued the cause for respondents (*Irwin I. Kimmelman,* Attorney General of New Jersey, attorney; *Boris Moczula* and *Florence V. Hughes,* Deputy Attorney General, of counsel).

## ORDER PENDING DECISION AND OPINION

Oral argument in this matter having been conducted on November 29, 1983, following the consolidated hearings before the Monmouth County District Court on temporary remand pursuant to this Court's Order of September 8, 1983, and the parties having had the opportunity to address the questions specified in the Order of this Court dated October 26, 1983, and the Court on its own motion having expanded the record in this appeal to include relevant portions of the record in the case of

*State v. Lopat,* as set forth in the letter of the Clerk of the Court to all counsel dated December 8, 1983; and

The Court having duly considered and determined the merits of the appeal and having decided that its essential rulings should be communicated to the parties and to the public without further delay in the form of the within Order with the opinion presenting more fully the reasons for the Court's decision to be issued at a later date; and

Good cause appearing;

It is ORDERED that:

1. The Smith and Wesson Breathalyzer Models 900 and 900A are found to be scientifically reliable and accurate devices for determining the concentration of blood alcohol. Such scientific reliability shall be the subject of judicial notice in the trial of all cases under *N.J.S.A.* 39:4–50.

2. The results from the administration of the Smith and Wesson Breathalyzer Model 900 (Model 900) have not been shown to be affected by radio frequency interference (rfi) except under the most unusual circumstances, which are highly unlikely to occur in the use of this instrument. The results of the administration of the Model 900 can be received in evidence in accordance with the standards under *State v. Johnson,* 42 *N.J.* 146 (1964), without further proof establishing any additional conditions for admissibility relating to the effects of rfi, provided that the current practice of banning hand-held transmitters from any area in close proximity to the breathalyzer instrument has been followed.

3. The results from the administration of the Smith and Wesson Breathalyzer Model 900A (Model 900A) can be affected by rfi under certain circumstances. Results from a Model 900A can be received in evidence in any case under *N.J.S.A.* 39:4–50 that is now pending untried or that may be filed in the future, provided either of the following conditions for admissibility relating to the effect of rfi is satisfactorily established in

accordance with the standards under *State v. Johnson,* 42 *N.J.* 146 (1964):

a. if the results of the administration of the instrument consist of two readings or tests within a tolerance of 0.01 percent of each other, the results shall be fully admissible without additional proofs relating to the effect of rfi;

b. if the condition set forth in subsection a. is not applicable or is not established, then a determination of the rfi-sensitivity of each such instrument shall be made through the use of periodic on-site tests or inspections in accordance with the procedures followed by the New Jersey State Police since September 1983;

(i) if it is determined by such procedures that the instrument is not rfi-sensitive, the results of the administration of said instrument shall be fully admissible in evidence as set forth in paragraph 2 with respect to Model 900; or

(ii) if it is determined by such procedures that the instrument is rfi-sensitive, the results from the administration of such instrument shall be admitted into evidence provided it is established that at the time the instrument was used, hand-held transmitters were banned from any area in close proximity to the instrument, mobile transmitters were not present in any area in close proximity to the instrument, and the instrument was shielded from outside radio frequency interference.

4. Any prior conviction that was based upon the results of the administration of a Model 900A instrument may be set aside upon a motion of defendant brought within two years of the date of the judgment of conviction under *R.* 7:4–7 on grounds that the possible effects of rfi upon the results of the administration of such breathalyzer instrument constitute newly discovered evidence, provided:

a. the administration of the breathalyzer instrument occurred on or before June 1, 1983;

b. the defendant proves by a preponderance of the evidence that there was no sufficient independent competent and credible evidence of intoxication in support of the conviction aside from the results of the administration of the instrument; and

c. the State then fails to establish in accordance with the standards under *State v. Johnson,* 42 *N.J.* 146 (1964), either of the conditions of admissibility set forth in paragraphs 3(a) or (b).

5. Any matter now in dispute in the within appeal and not adequately resolved by the terms of the within Order may, to the extent deemed necessary, be settled by the Court on its own motion or on the application of any party by further supplemen-

tal order or by the issuance of its final decision and opinion in this case.

6. All pending untried and future cases under *N.J.S.A.* 39:4–50 shall be prosecuted in accordance with the terms of the within Order, which shall remain in effect unless otherwise modified by further order or final decision of this Court.

7. The individual cases that were the subject of the within appeal are hereby remanded for trial and disposition in accordance with the terms of this Order to the Monmouth County District Court, now known as the Special Civil Part, Law Division, Superior Court, Monmouth County. Other than as provided for by this Order, jurisdiction over these matters is not retained.

The opinion of the Court was delivered by

HANDLER, J.

Each of the individual plaintiffs in these cases had been charged in separate municipal courts with driving while under the influence of intoxicating liquor, in violation of *N.J.S.A.* 39:4–50. The respective charges against each plaintiff were based in part upon the results of the administration of Smith & Wesson breathalyzer instruments. Plaintiffs brought an action in the Superior Court, Law Division, against the State of New Jersey, the Attorney General, and the Superintendent of the New Jersey State Police, alleging that the Smith & Wesson breathalyzer models 900 and 900A (models 900 and 900A) were unreliable and that their use by the State to furnish evidence of guilt was unconstitutional and unlawful.

The impetus for plaintiffs' suit was the April 6, 1983 decision of a municipal court judge in a case entitled *State v. Lopat.* In that case, the judge had found models 900 and 900A unreliable because of their susceptibility to radio frequency interference and, accordingly, refused to admit those test results into evidence to prove a violation of *N.J.S.A.* 39:4–50. Relying upon that decision, plaintiffs in their case claimed that the use of

these breathalyzer instruments violates their due process rights under the federal Constitution and their protectable interests under 42 *U.S.C.* § 1983 (1976) (section 1983). They sought relief on these claims and an injunction against the use of models 900 and 900A test results as evidence in pending and future drunk driving proceedings. Further, they requested an order providing for new trials for all persons convicted on evidence obtained from these breathalyzer models, and a prohibition against the use of any prior conviction that was based upon such test results to determine second or subsequent offender status of persons charged under *N.J.S.A.* 39:4–50.

The trial court issued a temporary restraining order prohibiting the introduction of models 900 and 900A test results in all cases unless, as a foundation, the State could demonstrate that it had complied with certain procedures prescribed by Smith and Wesson for determining which test results from a particular instrument might have been affected by radio frequency interference. Later, on cross motions for summary judgment, the trial court rejected plaintiffs' claim that under a theory of collateral estoppel, the decision in the *Lopat* case—that models 900 and 900A were unreliable—was binding on the court. The trial court denied as well plaintiffs' motion for certification of the suit as a class action. The trial court also denied defendants' motion to dismiss, and scheduled the matter for hearing.

The parties on both sides sought leave to appeal, which was granted before the hearing at the trial level. The Appellate Division affirmed the denial of class action certification and the denial of plaintiffs' motion for summary judgment on the ground of collateral estoppel. In addition, the court ruled that plaintiffs failed to state a claim cognizable under section 1983. Further, the court determined that plaintiffs individually were entitled to seek relief in municipal court from any prior convictions and new trials on the basis of newly discovered evidence, if brought within time under *R.* 7:4–7. The court also noted

that none of the pending charges against plaintiffs had been tried and plaintiffs, and all other similarly situated parties, would have the opportunity at trial to challenge the reliability of the breathalyzer instruments and the admissibility of their test results in individual prosecutions. Accordingly, the Appellate Division reversed the trial court's denial of defendant's motion to dismiss plaintiffs' complaint and vacated the restraints that had been imposed by the trial court. *Romano v. State*, 190 *N.J.Super.* 554 (1983).

This Court certified the case, 94 *N.J.* 610 (1983), but denied a stay of the Appellate Division decision. The certification was limited to those issues relating to the reliability of models 900 and 900A and the admissibility in evidence of the test results from the use of these instruments. It did not include issues relating to the rejection by the Appellate Division of constitutional claims, or those made pursuant to section 1983, or to the refusal to certify the action as a class action. The Court also recognized that the plaintiffs in this action were named defendants in separate pending municipal court cases, and that the issues in those seven cases paralleled the issues in the certified appeal. Accordingly, the grant of certification in this case was deemed to include the seven individual municipal court actions. In a separate order, the Court specially remanded the seven municipal court cases for a limited hearing on the admissibility of breathalyzer tests, in terms of both the general reliability of breathalyzers and the use of the test results in the case of each plaintiff. For purposes of the limited remand, the Court directed that the seven actions be consolidated and transferred to the Monmouth County District Court and assigned to Hon. Patrick J. McGann, J.S.C., pursuant to *N.J.S.A.* 2A:6-37 and *R.* 7:1.

Those hearings were conducted in September 1983. Plaintiffs took the position that the question of the breathalyzers' reliability had been dispositively resolved in the *Lopat* case, and, thus, they did not intend to contest the breathalyzer

readings in their respective individual cases. Consequently, they offered no witnesses or additional evidence. The State presented several witnesses who gave extensive testimony and presented documentary proofs.[1]

Judge McGann's findings of fact were filed with this Court. On October 26, 1983, we directed that oral argument and briefs be presented relating to all of the cases that had been certified, namely, the appeal of the action that had been brought by plaintiffs to secure injunctive and related relief in the Superior Court and the individual municipal court actions in which plaintiffs had been charged as defendants. We also directed the parties to address eight specific legal questions. Following oral argument, the Court granted in part plaintiffs' motion to supplement the record in this appeal by directing that portions of the record in the *Lopat* case be included in the present appellate record for the Court's consideration. The included transcripts related to the testimony of the experts in *Lopat* produced by both the State and the defendants.[2] The Court afforded the parties the opportunity to present further argument concerning the significance of the *Lopat* evidence on the issues in this case. On March 26, 1984, we issued an Order and Decision containing our determination of the meritorious issues raised by this appeal. *Infra* at 71. This opinion states the reasons for the rulings contained in our order.

---

[1]The State produced the following expert witnesses whose testimony is recapitulated in Judge McGann's decision and whose qualifications and experience are recited in an appendix to his decision: Warren A. Kesselman, Norman R. Coltri, Richard Saferstein, Herbert Belin, Arthur L. Flores, John R. Neubauer, and Mary D. Cox. The trial judge observed that defense counsel engaged in extensive and effective cross-examination of the State's experts.

[2]The State's experts in *Lopat* were Norman Coltri and Richard Saferstein. Defense experts were Thomas Listing, G. Foster Hersch, Vito Puleio and Dr. David Lester. Other witnesses whose transcribed testimony was also considered were Sergeant Peter Bernaducci, Trooper Robert Dafeldecker, Sergeant Kenneth Neubauer and Billy Gibson.

I

The threshold issue posed by the Court relates to the general reliability of the breathalyzer instruments for determining the concentration of alcohol in the blood. While this litigation was not prompted by any renewed special concern as to the basic reliability of the models 900 and 900A to measure blood alcohol content, the recent realization that the instruments can in some ways be detrimentally affected by radio frequency waves suggests that the question of general reliability be reexamined.

Each of the plaintiffs in this case has been charged with a violation of *N.J.S.A.* 39:4–50 based on breathalyzer test results obtained prior to the recent amendment of the statute, effective April 7, 1983. As applicable to plaintiffs, the statute then provided "[a] person who operates a motor vehicle while under the influence of intoxicating liquor" is in violation of the law. *N.J.S.A.* 39:4–50(a). The statute also provided:

In any prosecution for a violation of R.S. 39:4–50 relating to driving a vehicle while under the influence of intoxicating liquor, the amount of alcohol in the defendant's blood at the time alleged as shown by chemical analysis of the defendant's blood, urine, breath, or other bodily substance shall give rise to the following presumptions:

\*      \*      \*      \*      \*      \*      \*      \*

(3) If there was at that time 0.10% or more by weight of alcohol in the defendant's blood, it shall be presumed that the defendant was under the influence of intoxicating liquor.

The statutory amendment of April 7, 1983 provides that "[a] person who \* \* \* operates a motor vehicle with a blood alcohol concentration of 0.10% or more by weight of alcohol in the defendant's blood" violates the law. *N.J.S.A.* 39:4–50(a), as amended by *L.*1983, *c.* 129 § 1. As noted in the accompanying statement of purpose, the amended law "requires that a person whose blood alcohol concentration is 0.10% or greater be considered guilty of driving while intoxicated. Current law merely creates a presumption that such a person was under the influence of intoxicating liquor." Consistent with this purpose, the amendment, *L.*1983, *c.* 129, § 2, deleted from the statute the terms of *N.J.S.A.* 39:4–50(a)(3).

The initial questions that the parties were directed to address called for a reconsideration of the basic premise that the breathalyzer is a scientifically reliable instrument. The first question posed by the Court was whether models 900 and 900A are generally scientifically reliable and accurate instruments for determining the alcohol content of the blood. The second was whether the results of a breathalyzer test should be generally admissible in evidence when the breathalyzer is in proper working order and is used by a competent operator, and whether these results can form the basis upon which the conviction of violating *N.J.S.A.* 39:4–50 may be obtained.

In treating the basic issue framed by these questions, Judge McGann recognized that a clear understanding of the workings of the breathalyzer instrument was indispensible. We accept his accurate and complete description of the breathalyzer, *viz*:

The instrument is essentially a light balancing device. It contains a light source positioned between two photoelectric cells. Each cell is connected electronically to opposite sides of a current reading meter. When the light is turned on, electric energy is produced by the photoelectric cells which causes a current to flow into the meter. The meter needle will deflect from center one way or the other depending on which current is stronger. The light between the photoelectric cells can be mechanically moved by means of an adjusting knob geared to a finely threaded shaft closer to one cell or to the other. Because photoelectric energy produced by each of the cells varies with the distance from the light, the light can be moved so that the current strength produced by each is equal and opposite. The meter needle is centered indicating zero current flow through it. Between the light and each of the cells is a receptacle for an ampule—a sealed glass container with a solution of potassium dichromate and sulphuric acid. The light thus passes through each of the ampules before striking the photoelectric cell. The solution is a lemon yellow in color. With solutions of the same color the meter needle registers zero current. To conduct a test the seal on one of the ampules is broken and the breath sample is bubbled through that solution. Any alcohol in the breath reacts with the potassium dischromate and effectively fades or lightens the color of the solution. The more alcohol in the breath—the lighter the solution becomes. More light from the source is allowed to strike the photoelectric cell on that side than before; more photoelectric energy is produced; more current results and the meter needle then moves—proportionately to the amount of alcohol in the breath. The source light can then be shifted by use of the threaded screw away from the test ampule and toward the reference ampule. In this fashion the amount of light striking each photoelectric cell can be equalized and the meter needle again brought to zero reading. The distance traveled by the

source light on the threaded screw is thus a measure of the alcohol in the breath. By mechanical calibration this distance is read off on a separate scale as a percent of alcohol in the breath.

In New Jersey, the results of scientific tests are admissible at a criminal trial only when they are shown to have "sufficient scientific basis to produce uniform and reasonably reliable results and will contribute materially to the ascertainment of the truth." *State v. Hurd*, 86 *N.J.* 525, 536 (1981) (quoting *State v. Cary*, 49 *N.J.* 343, 352 (1967)). Scientific acceptability need not be predicated upon a unanimous belief or universal agreement in the total or absolute infallibility of the techniques, methodology or procedures that underlie the scientific evidence. *See, e.g., State v. Hurd, supra,* 86 *N.J.* at 538 (hypnotically refreshed testimony may be admissible if it can be demonstrated that use of hypnosis in given case was a reasonably reliable means of restoring memory); *State v. Cavallo,* 88 *N.J.* 508 (1982) (diagnosis of tendency to commit rape on basis of "rapist profile" is not scientifically reliable when procedure is not shown to be accepted generally by scientific community). Reliability of such evidence must be demonstrated by showing that the scientific technique has gained general acceptance within the scientific community. *State v. Johnson,* 42 *N.J.* 146, 170–71 (1964). The fact that a possibility of error exists does not preclude a conclusion that a scientific device is reliable. This Court in *Johnson* noted: "Practically every new scientific discovery has its detractors and unbelievers, but neither unanimity of opinion nor universal infallibility is required for judicial acceptance of generally recognized matters." *Id.* at 171. Once the showing of general acceptability has been made, courts will take judicial notice of the given instrument's reliability and will admit in evidence the results of tests from the instrument without requiring further proof. *Id.*

Until recently, models 900 and 900A had been considered in New Jersey to be scientific instruments generally accepted in the scientific community as reliable, and to be an appropriate subject of judicial notice. *See State v. Johnson, supra,* 42 *N.J.*

at 170. In order to use breathalyzer test results as evidence in a trial charging a violation of *N.J.S.A.* 39:4–50, the State had clearly to establish that (1) the equipment was in proper order— that it was periodically inspected in accordance with accepted procedures; (2) the operator was qualified to administer the instrument—that these qualifications as a breathalyzer operator were properly certified; and (3) the test was given correctly—that it was administered in accordance with the official instructions for the use of the instrument. *State v. McGeary,* 129 *N.J.Super.* 219, 224 (App.Div.1974) (citing *State v. Johnson, supra,* 42 *N.J.* at 170–71).

The breathalyzer instrument has both chemical and electrical components. The experts in this case recognized generally that all electronic equipment is susceptible to radio frequency interference. However, according to the experts, susceptibility to such interference alone will not necessarily render a device inoperative or inaccurate when used in an environment or setting that is intended and accepted as suitable for the use of such equipment. The experts concluded that, in spite of radio frequency interference problems, models 900 and 900A were scientifically reliable instruments. Additionally, the National Highway Traffic Safety Administration (NHTSA), continues to keep models 900 and 900A on its qualified products list. This indicates that, according to the NHTSA, the breathalyzer instrument is an approved product that has been shown to be capable of providing accurate analysis of blood alcohol content of a breath sample suitable for use as evidence in the trial of an individual suspected of drunk driving.

Further, the validity of the chemical process involved in the operation of the breathalyzer instrument has not been challenged or impugned.[3] As Judge McGann noted, there was basic

---

[3] As noted earlier, the chemical principle of the breathalyzer involves the interreaction of breath alcohol with a chemical solution and its measurable effect on a light source. This measurement is converted into blood alcohol content. See discussion *supra* at —— – ——.

agreement among the experts that radio frequency energy would have no chemical effect on the ampules or their content. The judge observed that there is no "residue of legal concern that the breathalyzer, given proper functioning and operated by a competent person, is 'a scientifically reliable and accurate device for determining the alcoholic content of the blood'" (quoting *State v. McGeary, supra,* 129 *N.J.Super.* at 223).

█ █ We hold that in its totality models 900 and 900A are scientifically reliable for the purpose of determining the content of blood alcohol (with the narrow qualification as to the admissibility of test results relating to the possible effects of radio frequency interference, discussed *infra* at 82–89). As stated in paragraph one of our order, "[t]he Smith and Wesson Breathalyzer Models 900 and 900A are found to be scientifically reliable and accurate devices for determining the concentration of blood alcohol. Such scientific reliability shall be the subject of judicial notice in the trial of all cases under *N.J.S.A.* 39:4–50." *Infra* at 72. In addition, we hold that the results of a breathalyzer test shall be generally admissible in evidence when the breathalyzer instrument is in proper working order, is administered by a qualified operator and is used in accordance with accepted procedures, and that such results may, upon the establishment of these conditions, form the basis upon which a conviction of violating *N.J.S.A.* 39:4–50 may be obtained.

II

An extremely narrow and limited qualification as to the general admissibility in evidence of the results of the use of a breathalyzer instrument must be recognized in certain special situations raising a possibility of radio frequency interference. The central issue on this appeal was generated by the relatively recent discovery that the accuracy of breathalyzer readings can be affected by interference from radio frequency waves. According to the evidence and findings below, radio frequency interference (sometimes designated herein as "rfi") describes

the effect on an electronic instrument of a radio wave or current that it is not designed to pick up. If a particular breathalyzer, as an electronic instrument, were susceptible to rfi, then the measurement of the light distance obtained when the operator balances the meter might not be an accurate indication of the amount of alcohol in the breath sample. Instead, the light distance might reflect, in part, a deflection in the meter needle caused by a stray current induced by radio waves in the surrounding environment.

In order for radio frequency interference to affect a susceptible breathalyzer instrument in a way that would lead to an erroneous reading, certain conditions must occur. The coalescence of these conditions has been referred to as the "window of susceptibility." First, because each instrument exhibits different degrees of susceptibility to rfi, the radio frequency source would have to be transmitting at a frequency to which the particular instrument was sensitive. Second, this source would have to be powerful enough to affect the instrument. Third, the proximity and direction of the breathalyzer in relation to the source of radio frequency transmission would have to allow radio frequency energies of sufficient strength to affect the instrument. Fourth, such radio frequency transmission would have to be present while the meter and light are activated in order for it to affect the instrument. (The activation of the meter and light occurs only when the operator balances the machine, which balancing is done twice during each test for a period of about ten seconds.) A final condition is that the needle fluctuation caused by the interference would have to be imperceptible to the operator.

The record discloses that numerous experiments were conducted by several agencies interested in identifying and solving the problems of rfi in the administration of breathalyzers. This extensive testing of models 900 and 900A was aimed at determining how often the "window of susceptibility" opened, meaning how frequently the necessary conditions existed in combination so as to affect the test results. The testing demonstrates

that unless all or most of these conditions are present, there is virtually no possibility that rfi can affect the results of administration of the breathalyzer.

Since the major problem occasioned by rfi effects concerned the use of the breathalyzer in drunk driving cases, the testing of instruments focused on interference caused by radio waves typically found in a police station environment. In this setting it was ascertained that radio frequencies creating the possibility of interference were caused generally by three types of equipment, but only while in the "transmit mode": the police base station transmitter, mobile transmitters located in police patrol cars, and hand-held units. In view of this evidence, we requested counsel to consider whether, without any proof to negate the possible effect of rfi, the breathalyzer readings of models 900 and 900A can be admitted in evidence and form the basis upon which a conviction under *N.J.S.A.* 39:4–50 may be obtained.

## A

We accept Judge McGann's determination that model 900 is "so highly insensitive to radio frequency interference that for all practical applications it is not affected by radio frequency energy." As noted by Judge McGann, "[t]ests on the model 900 breathalyzer indicate that the interference needed to cause a spurious deflection of the galvanometer is so extreme that it would be nearly impossible for an operator not to notice it." Judge McGann found that only when hand-held transmitters were placed directly on top of the instrument was a deflection noted. In addition, the record discloses that the New Jersey State Police adopted procedures for the administration of the breathalyzer test designed to eliminate the possibility that the results could be affected by rfi. Specifically, these procedures

include the removal of hand-held transmitters from any area in close proximity to the breathalyzer instrument.[4]

■ We hold, in the terms of paragraph two of our order, that "[t]he results of a Smith and Wesson Breathalyzer Model 900 * * * have not been shown to be affected by radio frequency interference * * * except in the most unusual circumstances, which are highly unlikely to occur in the use of this instrument. The results of the administration of the Model 900 can be received in evidence in accordance with the standards under *State v. Johnson*, 42 *N.J.* 146 (1964), without further proof establishing any additional conditions for admissibility relating to the effects of rfi, provided that the current practice of banning hand-held transmitters from any area in close proximity to the breathalyzer instrument has been followed." *Infra* at 72–73.

### B

We reach a different determination with respect to model 900A.[5] The trial court determined that only a few of the model 900A breathalyzer instruments were found to be susceptible to rfi. Accordingly, the use of model 900A instruments and the

---

[4]These procedures, adopted in July 1982, were the subject of the testimony of Sergeant Kenneth Neubauer, who had been a member of the New Jersey State Police for 20 years. Sergeant Neubauer testified in the hearings involved in *State v. Lopat*, as well as in the hearings conducted by Judge McGann in this case. The New Jersey testing procedure differed from that recommended by Smith & Wesson but was, nonetheless, approved by Smith & Wesson in May 1983.

[5]Essentially, model 900A is distinguishable from model 900 because of the type of meter it uses for measuring current. As noted by Judge McGann:

Model 900 uses a galvanometer—a very sensitive current measuring device. The 900A uses a null meter, a less sensitive (and far less expensive) meter. Because the null meter requires stronger current to cause appreciable deflections, an electronic amplifier circuit is interposed in the 900A between each photoelectric cell and the meter to amplify the current generated by the cell ... Th[is] difference in electronic circuitry between the 900 and 900A is, apparently, the principal reason for their differing reaction to [radio frequency] interference.

admissibility of the test results from these instruments were the occasion for more particularized fact-finding.

Notwithstanding the special problem posed by the possible rfi-sensitivity of some model 900A breathalyzers, the evidence adduced demonstrated a completely satisfactory method for excluding any possibility that test results in a given case could have been affected materially by interference from radio frequency. This method consists of the administration of two tests upon the subject, using the same breathalyzer instrument, and comparing the results of these tests. Accordingly, we specifically requested the parties to address on appeal the significance of this procedural safeguard.

This question was prompted by the evidence at the hearing. Two of the experts testifying before Judge McGann were of the opinion that the administration of two tests each producing readings of 0.01 percent of the other is a sure indication of the reliability of the breathalyzer instrument and a reliable indication that its results were not affected or tainted to any cognizable extent by radio frequency interference. According to the experts, when the results of two tests are within a tolerance of 0.01 percent of each other, these results can be regarded as reliable without any additional proof concerning the rfi-sensitivity of the instrument. Consequently, the two-test procedure is highly important in the regular use of the breathalyzer instrument and, when followed, can be dispositive in terms of determining the reliability of the results. Judge McGann accepted this evidence, as do we, in concluding that the two-test procedure that produces results within a mutual tolerance or range of 0.01 and thereby satisfactorily establishes the reliability of model 900A breathalyzer results, obviates any further requirement that the instrument be found to be insensitive to rfi and justifies admission in evidence of the results.

It was recognized with respect to model 900A that convictions under *N.J.S.A.* 39:4–50 might be based on one breathalyzer test result, or two test results not within 0.01 percent of each other.

We therefore directed the parties to consider the conditions that should be established in situations in which the possibility of rfi-sensitivity is not dispelled by the two-test procedure.

As noted, as a result of extensive testing performed on model 900A, it was found that a small number of the instruments may be sensitive to rfi. Judge McGann determined that the testing procedure adopted in September 1983 by the New Jersey State Police was scientifically adequate to identify whether a particular breathalyzer instrument was rfi-sensitive. Judge McGann concluded that the results from the use of instruments identified as insensitive to rfi would be valid and reliable if the tests were performed in a normal or conventional electromagnetic environment in which the instrument is kept at a location fixed for testing purposes and the subject is brought to the instrument for the administration of the breathalyzer test.

For those model 900A instruments identified as rfi-sensitive under the September 1983 procedures, Judge McGann concluded that the procedures for administering breathalyzer tests recommended by the State Police in July 1982 would guarantee, beyond a reasonable doubt, that the readings would be unaffected by rfi. *Supra* at 85 n. 4. These procedures included the removal of hand-held transmitters from the breathalyzer room during testing, keeping mobile police car transmitters away from areas in close proximity to the breathalyzer room, and using extra care in shielding the instrument from outside interference. The evidence in the record before us supports the findings and conclusions of Judge McGann.

■ Accordingly, we hold that the results of a model 900A breathalyzer test may be admitted in evidence and form the basis upon which a conviction under *N.J.S.A.* 39:4–50 may be obtained in any case pending untried or in any future case, provided either of two conditions of admissibility is satisfactorily established. The first condition involves the two-test procedure. If the breathalyzer results consist of two tests or read-

ings within a tolerance of 0.01 percent of each other that condition will have been met.

The second condition applies in other situations in which the two-test method is unavailable or has not been satisfied. In that situation, a determination of the rfi-sensitivity of the breathalyzer instrument shall be made in accordance with inspection procedures followed by the New Jersey State Police since September 1983.[6] If it is determined by such procedures that the instrument is not rfi-sensitive, the results of the breathalyzer instrument shall be fully admissible as in the case of the breathalyzer model 900. If, however, it is determined

---

[6]These State Police procedures were issued in May 1983 and adopted in September 1983 and are intended to identify which instruments are rfi-sensitive. The July 1982 testing instructions are intended to overcome the possibility of rfi in the administration of individual breathalyzer tests. In determining whether a particular breathalyzer instrument was rfi-sensitive at the time a blood alcohol content test was administered, procedures such as those adopted in September 1983 should be followed on a regular periodic basis. Evidence was adduced that a breathalyzer instrument checked and found to be insensitive to rfi in one location may nonetheless become susceptible if the operational environment used for such testing were subsequently altered; the electromagnetic environment can vary with any movement or change of the location of the breathalyzer instrument itself. To deal with this contingency, as well as other environmental changes, Smith & Wesson issued in September 1982 a customer advisory in which it recommended that new or additional tests to determine the susceptibility of breathalyzer instruments be undertaken if one of the following conditions occurred: (1) a change in the law enforcement department's radio operating frequencies or power output; (2) a change in the position, location, or type of base-station antenna; (3) a subsequent repair or calibration of the instrument; (4) a change in the operating location or general position of the instrument; and (5) a change in the general rfi background or environment of the instrument. Similarly, NHTSA, in its report, recommended that instruments be subjected to periodic inspections for rfi-sensitivity, even though previous tests or actual field experience had shown rfi to be minimal. The State Police, as noted, also implemented procedures that require the periodic testing of breathalyzer instruments. Accordingly, Judge McGann found that regular periodic tests would be necessary to identify susceptible equipment and he accepted as scientifically adequate for this purpose the New Jersey State Police testing protocol. We concur in this finding, which is subsumed in our accompanying order requiring continued adherence to the State Police testing protocol.

that the instrument is rfi-sensitive, then it must be shown that, in the administration of the breathalyzer instrument, hand-held police transmitters were prohibited in any area in close proximity to the instrument, police cars with transmitters were not permitted in any area in close proximity to the instrument and, further, extra care was used to shield the instrument from outside radio frequency interference. These rulings are reflected in paragraph three (a) and (b) of our order. *Infra* at 73–74.

### III

The parties were requested to address the general issue of the burden of proof. They were asked to consider both the level or standard of proof that should be required to establish conditions of admissibility and which party should have the initial and ultimate burden of proving any particular condition.

We have recognized in a variety of contexts that the burden of proof can vary depending upon the type of proceedings, the comparative interests of the parties, the relative litigational strengths or weaknesses of the parties, the access of the parties to proof, and the objectives to be served by the evidence in the context of the particular proceeding. *See In re Polk License Revocation,* 90 *N.J.* 550 (1982). Consistent with these considerations, it has generally been recognized that the burden of proof governing the admissibility of scientific evidence in criminal or quasi-criminal proceedings is substantial. *State v. Johnson, supra,* 42 *N.J.* 146.

While we acknowledge that the evidential burden in such cases is a substantial one, we conclude that the burden of proof to satisfy the conditions of admissibility in evidence of the results of the administration of a breathalyzer test is not to be equated with proof beyond a reasonable doubt. That highest burden of proof is applicable, of course, to establish ultimate guilt of a violation of *N.J.S.A.* 39:4–50. A lesser burden of proof, however, generally has been the standard applicable to

the admissibility of scientific evidence that is otherwise proba-
tive of ultimate guilt. *See, e.g., State v. Hurd, supra,* 86 *N.J.*
525; *State v. Cavallo, supra,* 88 *N.J.* 508. The results derived
from breathalyzer instruments constitute a form of scientific
evidence and conditions for their admissibility in evidence are
governed by the generally accepted standard of proof applica-
ble to such evidence. *State v. Johnson, supra,* 42 *N.J.* 146.

Accordingly, in this case we hold that the burden of proof
prescribed under *State v. Johnson, supra,* 42 *N.J.* at 171, is to
be followed to establish all of the conditions necessary for the
admissibility of a breathalyzer test. In drunk driving prosecu-
tions a substantial burden of proof to establish the competence
or admissibility of the results of the breathalyzer test is appro-
priate because of the serious consequences of the breathalyzer
reading in such prosecutions. *See State v. Johnson, supra,* 42
*N.J.* 146; *State v. Daly,* 126 *N.J.Super.* 313, 317 (App.Div.),
aff'd, 64 *N.J.* 122 (1973). For example, as to each of the
plaintiffs in the municipal court cases before us, breathalyzer
test results constitute presumptive evidence of guilt under the
pre-April 7, 1983 amended version of *N.J.S.A.* 39:4-50. As to
prosecutions based upon the results of breathalyzer tests ob-
tained after April 7, 1983, such tests may constitute the sole
evidence against a defendant and may alone become determina-
tive of a violation of the law. Consequently, the risk of using a
scientific procedure not capable of yielding reasonably reliable
results in a criminal or quasi-criminal trial should be reduced as
much as possible. *See State v. Hurd, supra,* 86 *N.J.* at 546-47
(clear and convincing evidence of scientific reliability necessary
as a basis for admitting hypnotically refreshed testimony).

Under *Johnson,* conditions of admissibility must be
"clearly established." 42 *N.J.* at 171. To avoid any confusion
over what is intended by this level of proof, it should be
understood that it conforms to that standard conventionally
referred to as "clear and convincing proof." The conditions of
admissibility to which this burden of proof shall apply include

those presently required to establish the admissibility of the results of a breathalyzer test, namely, the proper operating condition of the machine, the requisite qualifications of the operator, and the proper administration of the test. They shall also include, with respect to model 900A, those conditions we have now prescribed relating to the possible effects of rfi.

We hold further that the responsibility for establishing all conditions as to the admissibility of the breathalyzer results is properly allocated to the State. This is the rule with respect to the usual conditions of admissibility under *Johnson*. If the breathalyzer readings are obtained by an instrument exhibiting the possibility of interference from radio frequency waves, proof of the additional conditions negating the possibility of radio frequency interference, as delineated in our opinion and order, must be produced and shouldered by the State. This ruling is reflected in paragraph three of our order. *Infra* at 73.

## IV

Plaintiffs in the Superior Court action sought to set aside all prior convictions and obtain new trials for all persons convicted under *N.J.S.A.* 39:4–50 within two years preceding the Smith & Wesson customer advisory dated September 10, 1982. They claimed that the possible effects of radio frequency interference on breathalyzer results constituted newly discovered evidence under *R.* 7:4–7.

Consequently, we asked the parties to consider the extent to which a defendant charged as a second offender under *N.J.S.A.* 39:4–50 may challenge the validity of the prior conviction on the ground that it resulted from a breathalyzer test raising the possibility of inaccuracy attributable to rfi. If such a challenge were permitted, we also asked the parties to consider what showing would have to be made concerning the breathalyzer and the test results on which the prior conviction was based, as well as who would have the burden of proof.

■ In order to impugn a prior drunk driving conviction that serves to give a defendant the legal status of a second or subsequent offender, the prior conviction would have to be set aside on grounds that would justify the grant of a new trial on the prior offense. Rule 7:4–7, governing procedures before municipal courts, provides in part:

> The court may, on defendant's motion, grant him a new trial if required in the interest of justice. The court may vacate the judgment if entered, take additional testimony and direct the entry of a new judgment. A motion for a new trial based on the ground of newly discovered evidence may be made only before, or within 2 years after, final judgment.

The court rules clearly prohibit the extension of the two year limit for making a new trial motion. Rule 1:3–4(c) states: "Neither the parties nor the court may, however, enlarge the time specified by * * * R. 7:4–7 (motion for new trial) * * *." Rule 1:1–2 provides for relaxation of the rules if strict compliance would result in injustice.

■ The likelihood of breathalyzer test results being tainted by rfi is exceedingly small. Consequently, we are not impressed with the allegation that there has been a gross or widespread miscarriage of justice concerning past drunk driving convictions attributable to such a possibility. The consequences of a relaxation of the time limitations to seek a new trial would most likely be the inception of thousands of new trial applications and the retrial of scores of prior *N.J.S.A.* 39:4–50 offenses, with a small likelihood of many reversals. We therefore decline to relax or extend the time prescribed by the rules within which a motion for a new trial must be brought on the basis of newly discovered evidence consisting of the possibility of the effects of rfi on the results of breathalyzer tests. *See State v. Edwards,* 184 *N.J.Super.* 538 (App.Div. 1982); *State v. Sanducci,* 167 *N.J.Super.* 503 (App.Div.), certif. den., 82 *N.J.* 263 (1979); *State v. Tully,* 148 *N.J.Super.* 558, 562 (App.Div.), certif. den., 75 *N.J.* 9 (1977), relying on language in *State v. Tumminello,* 70 *N.J.* 187 (1976). We hold that any motion for a new trial on these grounds must be brought within two years of the judgment of conviction.

In general, a party seeking a new trial because of newly discovered evidence has the burden of showing that by due diligence such evidence could not have been discovered before the court announced its decision and that the evidence, if available and admissible, would probably alter the judgment. *State v. Carter*, 85 *N.J.* 300, 314 (1981); *State v. Sullivan*, 43 *N.J.* 209, 233 (1964); *cf. Quick Chek Food Stores v. Springfield Tp.*, 83 *N.J.* 438, 445 (1980) (discussing Rule 4:49–1, the civil practice rule complementing Rule 7:4–7). Drawing upon the record before us, we rule that a new trial based on newly discovered evidence consisting of breathalyzer test results that were affected by rfi may be brought only when a prior conviction was based on a breathalyzer test result from a model 900A instrument if the instrument has been identified as rfi-sensitive and only one breathalyzer reading was obtained or two breathalyzer readings were obtained but were not within a tolerance of 0.01 percent of each other. Consistent with our determination, only a conviction based upon such breathalyzer results could possibly have been affected by radio frequency interference.

As to such prior convictions implicating the possibility of rfi-effects, however, a defendant shall not be entitled to claim that the possible rfi effect upon the breathalyzer reading constitutes newly discovered evidence if the prior conviction was based on test results derived from the administration of the breathalyzer conducted after June 1, 1983. The *Lopat* decision, we note, was issued on April 6, 1983 and received wide publicity. In this case the trial court order granting a statewide prohibition against the continued use of the Smith & Wesson breathalyzers was dated April 26, 1983; it was published in the *New Jersey Law Journal*, 111 *N.J.L.J.* 481, on May 12, 1983. There were also well publicized proceedings in the Appellate Division during May 1983. The Appellate Division here observed that "[t]he susceptibility of the breathalyzer models in question to possible distortion by radio frequency interference is now a matter of public record." 190 *N.J.Super.* at 565. Consequently, after June 1, 1983 no defendant can reasonably

contend that the potential effects of rfi on a breathalyzer result must be regarded as "newly discovered evidence."

In all other cases involving prior convictions based on pre-June 1, 1983 test results raising the possibility of rfi-effects, the defendant shall be required to show that, given the possibility of rfi, there was at least a reasonable doubt as to the accuracy of the reading. As noted, these would involve only model 900A test results and the defendant would have to show under Rule 4:7–4 that the particular instrument had been used to produce one reading, or two readings not within 0.01 percent of each other. Further, it must be recognized that in a given case a defendant could have been convicted on evidence independent of the breathalyzer test result. *State v. Hudes*, 128 *N.J.Super.* 589 (Cty.Ct.1974). Before its recent amendment, *N.J.S.A.* 39:4–50(a) provided that any presumptions of intoxication based on test results

> shall not be construed as requiring that evidence of the amount of alcohol in the defendant's blood must be presented, nor shall they be construed as limiting the introduction of any other competent evidence bearing upon the question whether or not the defendant was under the influence of intoxicating liquor.[7]

The defendant, therefore, shall be required to show that the challenged conviction was based on the breathalyzer reading and could not have resulted or did not result solely from independent evidence of defendant's state of intoxication.

If the defendant overcomes these evidential hurdles, the State should then be required to produce evidence negating the likelihood of any effects from radio frequency interference in the use of the breathalyzer. If the State is able to show that by regular or periodic inspections performed on the particular breathalyzer instrument it was not rfi-sensitive, the defendant's new trial motion will be denied. However, if the instrument

---

[7]By contrast, under the amendment to this section, effective April 7, 1983, the statute now provides that a blood alcohol content of 0.10% constitutes a *per se* violation, regardless of the existence of any other evidence relating generally to whether or not defendant was "intoxicated." See discussion *supra* at 78–79.

was susceptible to rfi, then the State shall be able to produce evidence as to any conditions or procedural safeguards employed at the time of the test that would demonstrate the absence of radio frequency interference leading to erroneous readings. Upon the production of such proof, the motion for a new trial will be denied. These rulings governing motions to set aside prior convictions are contained in paragraph four of our order. *Infra* at 73.

V

We now answer several ancillary questions that have been raised by motion or argument. First, plaintiffs as defendants in the remanded municipal court actions have contended that they were treated unfairly in not having the opportunity or ability to produce experts as witnesses to counter the State's evidence in these proceedings. These contentions do not persuade us that these plaintiffs have been dealt with unfairly or the results we reach are incorrect or unjust.

Plaintiffs were given ample opportunity to obtain expert witnesses. They simply did not do so. We are not convinced that their failure in this regard was caused by impecuniosity. They were not, moreover, unduly circumscribed or disadvantaged by the absence of their own experts to counterattack through cross-examination the State's witnesses. Counsel for plaintiffs were thoroughly versed in the subject matter of the litigation and had demonstrated a mastery of the intricacies and nuances of the issues and the evidence. The attorneys for these parties had previously participated in the extensive, twenty-eight-day long trial of these almost identical issues in the *Lopat* case. Further, the trial judge did not make his findings of fact and conclusions on any mechanical application of the burden of proof. Judge McGann conscientiously elicited objective testimony from the several experts and reached his determination upon his own impartial weighing of the evidence.

■ Counsel for these plaintiffs have also insisted that they were fettered in this case as a result of conflicts of interest and the failure to obtain substituted counsel, which, they assert, prejudiced plaintiffs. The conflict is asserted to inhere in the possibility that other clients or defendants in other drunk driving cases may seek to take advantage of "favorable" breathalyzer test results, and would try to defend the reliability of the breathalyzer as a scientific device. The present plaintiffs, who have not yet been tried on underlying charges, seek to impugn the breathalyzer results in their individual cases and to show the scientific unreliability of the breathalyzer due to the possible effects of rfi. The suggested conflict is tenuous, if not fanciful or frivolous. Not a scintilla of prejudice to any plaintiff has been indicated through the representation they received from their present counsel.

## VI

We affirm the judgment of the Appellate Division in the Superior Court action, *Romano v. State, supra,* 190 *N.J.Super.* 554, the effect of which is to dismiss the plaintiffs' complaint. The rulings set forth in this opinion and the accompanying order as modified herein shall govern the trial of the municipal court cases, as well as all pending untried cases and cases that may be filed in the future that raise the issues addressed and determined in this appeal. Consistent with our earlier order for certification and limited remand, the municipal court cases in which plaintiffs are named defendants are remanded for trial to the Monmouth County District Court, now known as the Special Civil Part, Law Division, Superior Court, Monmouth County. We do not retain jurisdiction. No costs.

*For affirmance*—Chief Justice WILENTZ and Justices CLIFFORD, SCHREIBER, HANDLER, POLLOCK, O'HERN and GARIBALDI—7.

*For reversal*—None.