851 A.2d 123 (2003)
370 N.J. Super. 341
STATE of New Jersey, Plaintiff,
v.
Arnold FOLEY, Adam Gerzoff, Timothy Reid, Marjorie Proud, Paul Berry, Michael Bianco, Cheryl May, Lara Howell, Walter Behrle, Kristin Hahn, Paul Collins, Timothy Stillwell, Patrick Kollasch, John Clark, Nicholas Gagliardi, Robert Ferreri, Christopher Pasin, Hector Ramirez, Kyan Julius, and Fernando Cartagena, Defendants.
Superior Court of New Jersey, Law Division, Camden County.
Decided December 12, 2003.
*124 Joshua Ottenberg, Assistant Prosecutor, and Gladys Rodriguez, Assistant Prosecutor, appearing for plaintiff (Vincent P. Sarubbi, *125 Camden County Prosecutor, attorney).
Stephen Monson, Deputy Attorney General, and Christine Hoffman, Deputy Attorney General, appearing for plaintiff (Peter C. Harvey, Attorney General, attorney).
Jeffrey Gold, Cherry Hill, appearing for defendant Arnold Foley (Gold & Laine, attorneys).
Arnold Fishman, Haddon Heights and Craig R. Fishman, appearing for defendant Robert Ferreri.
Peter H. Lederman, Piscataway, appearing for defendant Marjorie Proud (Lamurro, Davison, Eastman & Munoz, attorneys).
John Menzel, Point Pleasant, appearing for defendant Fernando Cartagena.
ORLANDO, A.J.S.C.
This is a pre-trial hearing to determine the scientific reliability of the Alcotest 7110 MKIII C (hereinafter 7110) breath test instrument.
This court concludes that the 7110, which uses both infrared analysis and electrochemical analysis as a dual system of chemical breath testing, is scientifically reliable and accurate. Therefore, chemical breath test readings produced by the 7110 may be introduced in evidence in a prosecution for violation of N.J.S.A. 39:4-50, N.J.S.A. 39:3-10.13, or N.J.S.A. 12:7-46 without the need for the State to produce expert witnesses in each and every case. However, during the thirteen months in which the instrument was used by Pennsauken Township police a high and unacceptable number of persons who attempted to deliver a breath sample on the 7110 were charged with refusal to submit to a chemical test in violation of N.J.S.A. 39:4-50.2 and N.J.S.A. 39:4-50.4(a.) New Jersey must make changes in the software/firmware's requirements for the 7110 and/or in the instructions given to those who are about to use the instrument. Until this problem is eliminated no person who delivers a breath sample of .5 liters of air or greater during a test on the 7110 may be charged with refusal.
Procedural History
The Attorney General approved the 7110 as an instrument for evidential breath testing in New Jersey. N.J.A.C. 13:51-3.5(a) (2); N.J.A.C. 13:51-3.5(a)(2)(i); N.J.A.C. 13:51-3.6(c). The 7110 was placed in operation in Pennsauken Township in December 2000. The Pennsauken Township police tested persons suspected of operating a motor vehicle under the influence of alcohol on the 7110 from December 2000 through December 2001.
The Camden County Prosecutor made an application to this Court for a consolidated joint proof hearing on the scientific reliability of the 7110. The request related to cases pending before the Pennsauken Township Municipal Court. This Court granted the application.
Discovery was undertaken by the parties. The defendants were provided with documents, 7110 instruments and training sessions given by representatives of the manufacturer, Draeger. The parties exchanged expert reports and the evidential hearing began on September 8, 2003. The hearing concluded on October 14, 2003.[1] By November 6, 2003, the parties submitted post hearing briefs.

*126 The Instrument
The 7110 is an evidential breath testing instrument which uses infrared (IR) absorption analysis and electrochemical. (EC) cell technology analysis to simultaneously determine the presence of ethanol in a breath sample. Each method of analysis operates independently.
IR Analysis
Within the instrument a source emits an infrared light which is sensed by a detector. The infrared light from the source to the detector is established in the absence of alcohol as the baseline condition. When a breath containing alcohol is introduced into the chamber some of the infrared light is absorbed by the alcohol molecules and therefore does not reach the detector. The comparison between the presample IR and the sample IR transmission results in a lesser amount of infrared light with the sample present. The quantitative difference in the amount of infrared light reaching the detector is converted by the circuitry into a printed result which equates to the alcohol concentration of the person's breath.
EC Analysis
The instrument also contains a fuel cell which produces an electrical current. In the absence of alcohol the current is flat. When alcohol is introduced the electrons which flow between the anode and cathode on the fuel cell increase. This increase in the flow of electricity is interpreted by the 7110 as the effect of alcohol in the breath.
The 7110 uses both IR and EC analysis to determine simultaneously the presence of alcohol in a breath sample. Each method of analysis is performed independently. The two readings must be within an accepted tolerance established by Draeger to produce a valid reading.
InstrumentOperation
The instrument, if not a computer, has many of the same features as a computer. It contains a motherboard, a microprocessor, a lighted electronic display screen, a keyboard and memory. The instrument is an imbedded application which runs on firmware. The firmware has been developed by the manufacturer in accordance with specifications established by the State of New Jersey.
The breath testing sequence developed by the State of New Jersey for the 7110 consists of the following steps:
Air Blank and Ambient Air Check
The Air Blank draws room air into the instrument's chamber to clean it and remove any interfering substances. The Ambient Air Blank Check sets the IR chamber and EC chamber at zero.
Control Test
A known concentration of alcohol from the simulator is then pumped into the IR chamber and the EC chamber. This process produces a test result. The Control Test standard is generated from an ethanol solution that produces a simulated breath sample of 0.100 %. The control test function assures that the 7110 is operating properly at a known test value.
Air Blank
The Air Blank is repeated to clean the chamber after the control test.
Subject Breath Test # 1
The subject blows into the instrument. The State has established that for a breath sample to be acceptable the subject must blow for at least 4.5 seconds and deliver at least 1.5 liters of air at a flow rate of at least 2.5 liters/minute. The IR detector is making 128 readings a second to detect the presence of alcohol and to determine when the breath sample has reached a state of equilibrium. These minimum requirements *127 have been established by the State in an effort to assure that the breath sample contains deep lung or alveolar air which the scientific community regards as the air that provides the best approximation of the blood alcohol concentration of a suspect.
If the minimum requirements are not met, the 7110 will not provide a reportable breath test result. The lighted electronic display screen will advise the operator as to what requirement was not met. The following messages may appear on the screen: "Blowing Time Too Short", "Minimum Volume Not Achieved" or "Plateau Not Reached". The operator is not advised at that time as to what volume of air the subject delivered, the length of time the subject blew into the instrument, or the flow rate of the subject's breath. Finally the instrument displays the message "Refusal (Y)(N)", prompting the operator to make a choice. The operator will then decide whether to repeat the test or charge the subject with refusal.
If an acceptable breath sample is delivered and the IR and EC readings are within the tolerance established, the testing process continues.
Air BlankAn Air Blank Clear is conducted to clear the chamber before the second test is administered
Subject Breath Test # 2
A second breath test is given to the subject. The State has established that the tolerance between the two sets of breath tests must be 0.01 or +/- 10% of the average of the highest and lowest of the IR and EC readings to produce a reportable breath test result.
Air BlankAn Air Blank is conducted to clear the chamber.
Control TestAnother control test is administered to provide additional assurance that the breath tests were accurate when they were administered.
Air Blank A final Air Blank is done to clear the chamber.
At the conclusion of the testing procedure the 7110 produces a printed Alcohol Influence Report which contains all of the data about the entire test sequence. The printout sets forth the air blank and ambient air check, the temperature of the simulator solution, the IR and EC results of the control tests done at the beginning and end of the testing procedure, the volume of each breath sample, the flow rate of each breath sample, the IR and EC results of the breath samples tested reported to three decimal places and a composite breath alcohol result which is the lowest of the four readings (two IR and two EC), reported to two decimal places.
Scientific Reliability
Evidence of the breath test results produced by a chemical breath testing instrument will only be admitted if the proponent can prove that the instrument and the results generated by the instrument are generally accepted by the relevant scientific community. Frye v. U.S., 293 F. 1013 (D.C.Cir.1923); State v. Harvey, 151 N.J. 117, 699 A.2d 596 (1997); Romano v. Kimmelman 96 N.J. 66, 474 A.2d 1 (1984); State v. Johnson, 42 N.J. 146, 199 A.2d 809 (1964).
To establish general acceptance within the scientific community the proponent must meet the clear and convincing standard of proof. State v. Harvey, 151 N.J. 117, 171, 699 A.2d 596, 622 (1997). However, this does not require establishing complete unanimity within the scientific community, or complete infallibility of the new technology. Ibid. The New Jersey Supreme Court defined the applicable standard of proof in Romano v. Kimmelman, *128 supra, 96 NJ at 80, 474 A.2d 1, 8, as follows:
In New Jersey, the results of scientific tests are admissible at a criminal trial only when they are shown to have "sufficient scientific basis to produce uniform and reasonably reliable results and will contribute materially to the ascertainment of the truth." State v. Hurd, 86 N.J. 525, 536, 432 A.2d 86, 91 (1981) (quoting State v. Cary, 49 N.J. 343, 352, 230 A.2d 384, 389 (1967)). Scientific acceptability need not be predicated upon a unanimous belief or universal agreement in the total or absolute infallibility of the techniques, methodology or procedures that underlie the scientific evidence. See, e.g. State v. Hurd, supra, 86 N.J. at 538, 432 A.2d at 92 (hypnotically refreshed testimony may be admissible if it can be demonstrated that use of hypnosis in given case was a reasonably reliable means of restoring memory); State v. Cavallo, 88 N.J. 508, 443 A.2d 1020 (1982) (diagnosis of tendency to commit rape on basis of "rapist profile" is not scientifically reliable when procedure is not shown to be accepted generally by scientific community). Reliability of such evidence must be demonstrated by showing that the scientific technique has gained general acceptance within the scientific community. State v. Johnson, 42 N.J. 146, 170-171, 199 A.2d 809, 822-23 (1964). The fact that a possibility of error exists does not preclude a conclusion that a scientific device is reliable. This Court in Johnson noted: "Practically every new scientific discovery has its detractors and unbelievers, but neither unanimity of opinion nor universal infallibility is required for judicial acceptance of generally recognized matters." Id. at 171, 199 A.2d at 823. Once the showing of general acceptability has been made, courts will take judicial notice of the given instrument's reliability and will admit in evidence the results of tests from the instrument without requiring further proof. [Ibid].
General acceptance of any new technology can be proven in three ways:
1. By expert testimony as to the general acceptance, among those in the profession, of the premises on which the proffered expert witness based his or her analysis; or
2. By authoritative scientific and legal writings indicating that the scientific community accepts the premises underlying the proffered testimony; or
3. By judicial opinions that indicate the expert's premises have gained general acceptance.
State v. Harvey, supra 151 N.J. at 170, 699 A.2d at 621;
The State presented four expert witnesses, Dr. Kurt Dubowsky, Dr. Arthur Flores, Dr. Thomas Brettell and Hansueli Ryser. Each of these experts testified that the 7110 is a scientifically reliable breath testing instrument. These experts concluded that the breath alcohol readings reported by the 7110 are scientifically accurate. Dr. Dubowsky was the most impressive and persuasive of the witnesses. He is one of the world's foremost authorities in the fields of clinical and forensic chemistry and toxicology. During 1995-1996 he extensively tested the Alcotest 7110 Mark II for its analytical reliability and performance. He established that IR analysis has been accepted by the scientific community as a reliable method for evidential breath alcohol analysis since the 1970's. EC analysis has been accepted by the scientific community as a reliable means to conduct evidential breath tests since the 1980's. He testified that there is nothing unique about the IR and EC analyses performed by the 7110. The distinguishing feature of the 7110 is that it uses *129 both IR and EC analysis to produce quantitative answers on the same breath sample at the same time. He convincingly testified that neither the IR or EC analysis is compromised by performing tests on the same breath sample. The independent analyses of the same breath sample by IR and EC processes enhances the scientific reliability of the 7110. These test results must be within the tolerance established by Draeger to produce an acceptable breath alcohol reading.
Indeed Dr. Richard Saferstein, the defense expert, does not challenge the scientific reliability of the IR and EC processes as incorporated in the 7110. Dr. Saferstein's criticisms relate to the instrument's firmware designed according to New Jersey's specifications. He agrees that the breath test results reported by the 7110 are scientifically reliable within certain tolerances.
This Court concludes that the 7110 is a scientifically reliable evidential breath alcohol testing instrument. The combination of an IR and EC analysis on the same breath sample produces accurate and reliable results. The detailed information developed by the instrument on the Alcohol Influence Report assures that the instrument was functioning properly at the time the tests were administered. Therefore, chemical breath test readings produced by the 7110 may be introduced in evidence in prosecutions for violations of N.J.S.A. 39:4-50, N.J.S.A. 39:3-10.13 and N.J.S.A. 12:7-46 without the need for the State to produce an expert witness.

Refusals
The 7110 was in use in Pennsauken Township for thirteen months. During this time the 7110 produced Alcohol Influence Reports on 357 (according to the State) or 358 (according to defendants) persons. Ninety-nine of these individuals were charged with refusal to submit to a chemical test in violation of N.J.S.A. 39:4-50.2 and N.J.S.A. 39:4-50.4(a).
Dr. Dubowsky testified that the Pennsauken test results reflect an unusually high number of persons charged with refusal. He further noted that the Pennsauken data reflect an unacceptable number of instances when subjects were unable to provide the minimum breath sample established by New Jersey.
Dr. Saferstein also concluded that the number of persons charged with refusal after attempting to deliver a breath sample on the 7110 was unacceptably high. He undertook a detailed analysis of the Pennsauken data. He noted that of the ninety-nine persons charged with refusal, the Alcohol Influence Reports for thirty-eight reflected zero volume and zero duration for breath samples. He reasonably concluded that these persons did not make any effort to supply a breath sample. He therefore subtracted thirty-eight from the total number of persons tested and from the number charged with refusal. He then established two categories. The first category consisted of persons who delivered at least 1.0 liters of air and who were charged with refusal. There were thirty-six persons in this category which represents 11.3 % of all persons who were tested in Pennsauken. The second category is persons who delivered breath samples of .5 liters to .9 liters of air and who were charged with refusal. Fifteen individuals, representing 4.6 % of all persons charged with refusal, fell into this category. Thus 15.9 % of all persons who were tested in Pennsauken were charged with refusal despite the fact that they delivered at least .5 liters of air. Even Dr. Brettell, the State's Chief Forensic Scientist, conceded that 11.5% of persons who delivered a breath sample of 1.0 liters of air or greater were charged with refusal. Dr. Saferstein examined *130 over 25,000 breathalyzer cases. He estimated that in less than 5% of those cases was the individual charged with refusal.
One example of an individual who was charged with refusal in Pennsauken and who produced a volume of air greater than 1.0 liter is as follows:

 FIRST ATTEMPT Volume 1.0 liters
 Duration of Breath - 3.3 seconds
 Instrument Message - Minimum Volume Not Achieved
 SECOND ATTEMPT Volume 1.5 liters
 Duration of Breath 3.8 seconds
 Instrument Message - Blowing Time Too Short
 THIRD ATTEMPT Volume 1.6 liters Volume 1.6 liters
 Duration of Breath 4.7 seconds
 Instrument Message - Plateau Not Reached

This case illustrates the troubling pattern presented by the Pennsauken data in which persons who seemingly are making a good faith effort to deliver a breath sample are charged with refusal. This Court concludes that the number of persons charged with refusal who attempted to deliver a breath sample on the 7110 in Pennsauken to be too high and therefore unacceptable.
In assessing the scientific reliability of instruments, Courts, on occasion, have accepted the scientific reliability of an instrument but placed limitations on its use. The Supreme Court in Romano v. Kimmelman, supra, 96 N.J. 66, 474 A.2d 1, admitted the results of a Breathalyzer Model 900 A but required either that there be two readings within .01% of each other or that the instrument pass state police inspection procedures for Radio Frequency Interference (RFI). In The Matter of the Admissibility of Motor Vehicle Speed Readings Produced by the LTI Marksman 20-20 Laser Speed Detection System, 314 N.J.Super. 233, 714 A.2d 381 (Law Div. 1998), speed readings of the laser speed detector were found to be admissible without expert testimony except during heavy rain, snowfall or at distances in excess of 1000 feet. The trial court in State v. Wojtkowiak 170 N.J.Super. 44, 405 A.2d 477 (Law Div.1979), reversed on other grounds, 174 N.J.Super. 460, 416 A.2d 975 (App.Div. 1980) found that a speed reading from a moving radar instrument was scientifically reliable if operated in the manual mode.
Drs. Dubowsky and Saferstein have offered possible solutions to remedy the unacceptably high number of persons charged with refusal resulting from the present configuration of the 7110. These proposals include reducing the minimum breath volume to 1.0 liter, changing the blowing instruction from "take a normal breath and blow into the mouthpiece with one long continuous breath" to "take a deep breath and exhale all of it" and eliminating the prompt "Refusal (y) or (n)" from the instrument's message line. This court is unable to conclude based upon the evidence presented whether any or all of these suggestions would eliminate the refusal problem. The State will have to make the changes to the firmware parameters which it believes will rectify the problem. Then, through a period of field testing, determine if the desired result has been achieved. Until that has been done, no person who has delivered a breath sample of at least .5 liters on the 7110 may be charged with refusal.
The defendants have advanced other challenges to the admissibility of breath test results produced by the 7110. A number of those attacks are not related to the *131 scientific reliability of the instrument. I shall address the defendants' arguments in summary fashion.

Breath Temperature Monitor
The defendants assert that in order for the breath test results of the 7110 to be scientifically reliable the instrument must include the manufacturer's breath temperature monitor. The 7110 is the only evidential breath test instrument which offers a breath temperature monitor as an option. Only 1% to 3% of all the 7110's in use contain this option. The defendants assert that the 7110 presumes a breath temperature of 34° C. Actual breath temperature varies from person to person. An increase in temperature of 1° C above 34° C will overestimate a breath alcohol reading by 6.58%. The defendants assert that the breath temperature monitor is required in order for the reading produced by the 7110 to be scientifically reliable. The court rejects this contention. According to Dr. Dubowsky, the scientific community has not accepted the breath temperature monitor as an accepted feature of evidential breath testing instruments. Dr. Saferstein has never used or tested the breath temperature monitor which he advocates. Furthermore, even if the breath temperature monitor is accurate, it is not necessary to use this device to obtain scientifically reliable results. The 7110 is calibrated presuming the ratio between blood alcohol and breath alcohol is 2100 to 1. The factor of 2100 to 1 was developed by doing studies on persons in the field including both arrested subjects and research subjects. The breath temperature of all these subjects varied. Therefore, the 2100 to 1 ratio already subsumes within it the variation in breath temperature of the general population. Dr. Dubowsky notes that to the extent that a mean or average exists between blood alcohol and breath alcohol in the general population, it is 2300 to 1 not 2100 to 1. The calibration of the instrument at 2100 to 1 results in an underreporting of a subject's blood alcohol 97.5% of the time. See State v. Downie 117 N.J. 450, 569 A.2d 242 (1990). The average subject receives a 9.5% discount in the reported result. Dr. Dubowsky asserts that by using the 2100 to 1 ratio the blood alcohol reading for an individual with a 102° F temperature will still be underreported. A breath temperature monitor is, therefore, not necessary to assure scientifically reliable results.

Only Breath Reading within 0.01 % Tolerance should be compared:
The firmware developed by New Jersey for operation of the 7110 establishes the acceptable tolerance between sets of reportable readings. The standard established by Dr. Brettell, the State Chief Forensic Scientist, is that results will be accepted if they are within 0.01% of each other or ± 10% of the average of the highest and lowest of the IR and EC values generated, whichever is greater. The defendants assert that accepting results within 10% of the average runs afoul of a New Jersey Supreme Court mandate that acceptable readings must be within 0.01%.
This argument does not appear to relate to the scientific reliability of this evidential breath instrument but rather the parameters established by the State.
Furthermore this Court does not agree that the Supreme Court has announced a bright line rule regarding an acceptable tolerance level which would be applicable to the 7110. The Supreme Court in Romano v. Kimmelman, supra, 96 N.J. 66, 474 A.2d 1 considered whether readings reported by certain breathalyzer instruments are affected by radio frequency interference (rfi). The Court concluded that Model 900A could be affected by rfi under certain circumstances and, therefore, *132 required that in order for readings from the 900A to be admissible without expert testimony the instrument must produce two readings within 0.01% of each other. Thereafter in State v. Downie, supra, 117 N.J. 450, 569 A.2d 242, the Supreme Court directed a trial court to conduct an evidential hearing regarding whether the partition ratio variability compromises the scientific reliability of breathalyzer test results. The trial court made seven findings of fact. One finding was that the breathalyzer does not overestimate alcohol in the blood as long as two breath readings are taken within fifteen minutes of each other, they do not differ by more than 0.01%, and the lower of the two is used for proof purposes. The Supreme Court adopted each finding of the trial court. However, the Court did not, during the course of its opinion, discuss the accepted tolerance between the readings. It is unclear if the trial court's finding on this issue is just a restatement of the requirement announced in Romano to guard against the results being affected by rfi's. It is clear however, that the Supreme Court has never addressed an acceptable tolerance for the 7110.
The 7110 produces results which are more accurate and reliable than the breathalyzer. The EC and IR technologies generate more precise readings than the breathalyzer technology. The 7110 which relies on each of these processes to test the same breath sample produces results which have a scientifically reliable level of certainty. The tolerance for acceptable sets of reading of .01% or ±10% of the average of the highest and lowest of the IR and EC values generated is within scientifically accepted parameters.
The parameter of 0.01% agreement is the strictest standard in the United States. When one considers that what is being compared between two tests is four results (two IR and two EC), the additional parameter of ±10% is within the tolerance considered acceptable for reliable results by the scientific community. Indeed the defendants offered no evidence that the requirement was not within acceptable scientific parameters. The defendants argument is based solely on the assertion that the established tolerance levels exceed a Court mandated standard.
The defendants' legal position is not accurate, particularly as it relates to the 7110.

Public Notification of Software Changes/Printout To Contain Software Version
The defendants advance the position that the public should be notified of all changes in the software/firmware for the 7110 and that the Alcohol Influence Report should contain the software version in use on that particular instrument. These contentions go well beyond the scope of a hearing to determine the scientific reliability of this evidential breath testing instrument. The Supreme Court in State v. Garthe 145 N.J.1, 678 A.2d 153 (1996) held that only procedures that affect the conduct of a portion of the public require public notice. The Court concluded that because State Police procedures to test breathalyzer machines do not shape the conduct of the public, these procedures need not comply with the promulgation requirements of the Administrative Procedures Act, i.e., public notice. Similarly, changes in the 7110 software/firmware would not change the conduct of the affected public and therefore public notice is not required.

Fact Finder To Be Advised 7110 Subject to +/- Tolerance of 0.012%
All instruments contain a tolerance or margin of error. The defendants assert that the tolerance for the 7110 is ± 0.012% and that the fact finder in each case should be advised of this.
*133 In State v. Lentini, 240 N.J.Super. 330, 573 A.2d 464 (App.Div.1990) the defendants asserted that a reading on the breathalyzer of 0.10% should be adjusted downward because of the tolerance of the instrument. The court rejected this contention. The court noted that because it cannot be determined whether the tolerance is to be added or subtracted from the reported reading, the effect of considering the instrument's tolerance is to increase a per se violation from 0.10% to 0.11%. This contravenes the legislative mandate that a per se violation is established by a 0.10% reading. The holding in Lentini effectively disposes of the defendants' argument. An instrument's tolerance is not to be considered since it would alter the blood alcohol concentration level established by the legislature for a per se violation.

Institute Two Minute Interval Between Breath test (Interference Issue)
The defendants urge that there be a two minute interval between breath tests to eliminate the potential for mouth alcohol interference. The defendants produced no evidence that results of breath test performed in less than two minute intervals on the 7110 would be compromised or inaccurate. The basis for this suggestion appears to be a recommendation by Dr. Dubowsky in a 1994 article. Dr. Dubowsky stated that this recommendation was made to enhance quality assurance of instruments which pre-date the 7110. He clearly implied that the detailed information contained in the Alcohol Influence Report produced by 7110 eliminates the two minute interval as a requirement for the 7110.

Change Software So That Reported Breath Test Result Reports Lowest Test Value Of Breath Test Within Tolerance
If the reported breath test results of first and second tests are not within the established tolerance, a third test will be performed. The 7110 is designed so that the results of the third test will be compared with the results of the first test. If these are within the accepted tolerance, the comparison then stops and the lowest result will be reported. It sometimes occurs that the third test will be within the accepted tolerance when compared to both the first and second test and that comparison with the second test will produce a lower breath test reading. Because the comparison process stops if the first and third tests are within the accepted tolerance, the lower reading from the second will not be set forth as the Reported Breath Test Result. The defendants urge that this be changed so that the Reported Breath Test will be the lowest test value of all breath tests within tolerance
The 7110's Alcohol Influence Reports sets forth all breath test results. Thus the lowest reading within tolerance will be included in the report. Moreover, the State, through its witnesses and its post hearing brief, advises that this anomaly will be changed so that only the lowest breath test result, within acceptable tolerances, will be reported in the Reported Breath Test Result. This recommendation is therefore moot.

Conclusion
The 7110 uses IR and EC technologies to independently measure the blood alcohol concentration of a given breath sample. The reportable readings produced by the 7110 within the established tolerances are scientifically accurate and reliable and therefore will be admitted into evidence without the need for expert testimony. However, no person who delivers a breath sample of at least .5 liters may be charged with refusal.
NOTES
[1] By permission of the Court not all counsel for the defendants participated in the proceedings.