969 A.2d 522 (2009)
407 N.J. Super. 100
STATE of New Jersey, Plaintiff-Respondent,
v.
Geoffrey POLLOCK, Defendant-Appellant.
No. A-5958-07T4.
Superior Court of New Jersey, Appellate Division.
Submitted April 1, 2009.
Decided May 13, 2009.
Law Offices of Paul H. Scull, Jr., Pennsville, for appellant (Paul H. Scull, Jr., on the brief).
John T. Lenahan, Salem County Prosecutor, for respondent (Gregory G. Waterston, Assistant Prosecutor, on the brief).
Before Judges STERN, WAUGH and ASHRAFI.
The opinion of the court was delivered by
WAUGH, J.A.D.
Defendant Geoffrey A. Pollock appeals his conviction for a per se violation of N.J.S.A. 39:4-50, driving with a blood alcohol concentration of 0.08 percent or more. In this appeal, we are called upon to determine whether the semiannual-recalibration requirement for Alcotest machines, established *523 by the Supreme Court in State v. Chun, 194 N.J. 54, 943 A.2d 114, cert. denied, ___ U.S. ___, 129 S.Ct. 158, 172 L.Ed.2d 41 (2008), is applicable to cases in which the test was administered prior to Chun and in compliance with the then existing annual-recalibration protocol. Because we determine that the change mandated by Chun was not intended to be applied to pending cases, we affirm Pollock's conviction.

I
Pollock was arrested on February 16, 2008, in Carney's Point. He was charged with driving while under the influence of alcohol, N.J.S.A. 39:4-50, and other offenses not relevant on this appeal. He was administered a breath test to determine his blood alcohol content using the Alcotest 7110 MKIII-C (Alcotest) machine. The resulting Alcohol Influence Report (AIR) determined that his blood alcohol content was 0.17 percent.[1] The Alcotest machine used for Pollock's test had been recalibrated approximately seven months earlier, which was consistent with the then existing protocol established by the State.[2]
On March 17, 2008, the Supreme Court issued its decision in Chun, which generally upheld the reliability and admissibility of Alcotest results, subject to certain modifications and conditions. The Court included a requirement that the Alcotest machine be recalibrated semiannually, rather than annually. Chun, supra, 194 N.J. at 123, 943 A.2d 114.
Pollock then filed a motion in the Carney's Point Municipal Court, seeking to exclude his AIR report on the grounds that the machine had not been recalibrated within the six-month period prior to the date of his test as required by Chun. On April 25, 2008, the municipal court judge held a hearing pursuant to N.J.R.E. 104 and determined that the semiannual-recalibration requirement in Chun was not applicable to cases in which the test had been administered prior to Chun. After the judge denied his motion, Pollock entered a conditional guilty plea, R. 7:6-2(c), to a per se violation of N.J.S.A. 39:4-50, based on the 0.17 percent reading from the AIR report.
Pollock then appealed his conviction to the Law Division in Salem County, again arguing that Chun's semiannual-recalibration requirement was applicable retroactively. On June 13, 2008, Judge William L. Forester heard the matter de novo on the municipal court record. R. 3:23-8. Judge Forester delivered an oral decision on July 25, 2008, concluding that the new recalibration requirement was prospective only and convicting Pollock of violating N.J.S.A. 39:4-50. He signed the resulting order on August 1, 2008, but stayed the sentence and driver's license suspension until August 15, 2008.[3] This appeal followed.

II
On appeal, Pollock again contends that his AIR report was inadmissible because *524 the Alcotest machine used to analyze his breath samples had not been recalibrated during the prior six months as required by Chun. In support of his position, he argues that retroactive application is required by Chun itself and also by the general principles used to determine whether a new rule in criminal cases is given prospective or retroactive application.
Before turning to the specific issue of retroactivity, we must explore the Supreme Court's reasons for changing the recalibration protocol. The Supreme Court stated its overall conclusion in Chun, supra, 194 N.J. at 65, 943 A.2d 114, as follows:
In summary, we conclude that the Alcotest, utilizing New Jersey Firmware version 3.11, is generally scientifically reliable, but that certain modifications are required in order to permit its results to be admissible or to allow it to be utilized to prove a per se violation of the statute. Some of these conditions upon admissibility we impose as a matter of constitutional imperative, others as a matter of addressing certain of the device's mechanical and technical shortcomings that were revealed during the proceedings on remand. Within the framework for admissibility that we here establish, pending prosecutions should be able to proceed in an orderly and uniform fashion.
As will be seen, the semiannual-recalibration requirement arose out of technical concerns and was not one of those adopted "as a matter of constitutional imperative."
The recalibration issue arose when it was discovered that the two types of tests performed by the Alcotest machine, although generally independent of each other, have some limited interaction when the fuel cells used for one of them begin to age. Id. at 121-22, 943 A.2d 114. The two types of tests were explained by the Supreme Court as follows:
The Alcotest uses both infrared (IR) technology and electric chemical (EC) oxidation in a fuel cell to measure breath alcohol concentration. The device therefore produces two test results for each breath sample, one derived from an IR reading and the other, by and large, from an EC reading.
Although the precise mechanism by which these tests are accomplished is not relevant to the issues before us, the IR chamber, also called a cuvette, captures the breath sample and uses infrared energy to calculate absorption of the energy by the alcohol concentrated in the chamber. IR technology has been available since the 1970's or early 1980's and scientists have concluded that it is reliable. See, e.g., [State v.] Foley, [] 370 N.J.Super. [341,] 350[, 851 A.2d 123 (Law Div.2003)].
The EC, or fuel cell technology, uses a catalyst to absorb alcohol and provide a second measurement of breath alcohol concentration from a small sample captured from the cuvette. In the EC chamber, voltage is applied to cause the catalytic reaction, which causes any alcohol that is present to oxidize. As that occurs, the oxidation process creates electricity, which is then measured to determine the amount of alcohol interacting with the fuel cell.
[Id. at 78, 943 A.2d 114 (footnote omitted).]
After discussing other issues, the Court described the issue with respect to the frequency of recalibration in detail, including the positions taken by the parties, as follows:
One of the most controversial findings that came out of the second remand proceedings, during which the parties were afforded the opportunity to undertake *525 an analysis of the source code that is the heart of the operation of the Alcotest device, related to the EC readings. During the proceedings, the Special Master summoned Brian Shaffer, a Draeger[[4]] employee responsible for the code and for implementing changes to the New Jersey Firmware since the Foley decision, to testify. Near the end of his testimony, Shaffer revealed that Firmware version 3.11 utilizes a compensating algorithm to account, in part, for a phenomenon known as fuel cell drift.
As Shaffer explained it, the EC reading is obtained by passing an electrical current through a small sample of the breath that has otherwise been captured for IR testing in the cuvette. The fuel cell that creates the electrical charge reacts in the presence of alcohol. The reaction of the fuel cell can be represented graphically as a curve and the percentage of alcohol in the breath is measured by calculating the area under the curve mathematically. As fuel cells age, the area under the curve that expresses the same breath alcohol content is unchanged, but the shape of the curve itself changes from a high sharp peak to a longer, flatter one. As a matter of mathematical computation, the area being measured is the same even though the curves, were they plotted graphically, would appear to be different when observed visually.
According to Shaffer, the flattening of the curve is caused by the aging of the fuel cell, which reacts more slowly and with less intensity to the same amount of alcohol than when the fuel cell is new. This phenomenon, known as fuel cell drift, does not actually alter the accuracy of the EC measurement. However, because the fuel cell begins to react more slowly to the presence of alcohol as it ages, a portion of the area under the curve that is the basis for the alcohol measurement is not captured during the time when the Alcotest EC data is collected. Instead, a portion of the end of the curve is, in essence, cut off, resulting in a lower than accurate measurement.
Because fuel cell drift is a known scientific phenomenon that would otherwise result in an inaccurate underreporting of the percentage of alcohol in the test subject's breath, Draeger added a compensating algorithm into the firmware. The EC fuel cell drift algorithm, therefore, is intended to capture a portion of the missing data and, in theory, create a more accurate result as the reported EC reading. The algorithm, however, does not attempt to quantify the missing area under the curve per se, but instead attempts to compensate in part for the lack of complete data arising from the EC measurement. In the event that fuel cell drift is detected during the control test, the algorithm mathematically increases the EC reading that is reported by up to twenty-five percent of the difference between the IR and EC readings from the tests of the subsequent breath samples.
The compensating algorithm is not routinely applied, but only functions if the appropriate preconditions are met. The device, in performing the control test, compares the EC and the IR readings and accurately reports those results. Because the control test utilizes a known test solution to ensure that the device is functioning properly and that it accurately reads a solution of a known *526 percentage of alcohol, fuel cell drift can be detected from the control test's results. If the device detects drift, the algorithm will adjust the EC measurement standard, which, in turn, will slightly increase the reported EC results for the test subject's breath sample to account for the fuel cell drift.
The discovery of the EC fuel cell drift algorithm in the source code prompted the Special Master to conclude that more frequent re-calibration of the devices with replacement of fuel cells that had become "depleted" would reduce reliance on the EC fuel cell drift algorithm and, therefore, increase the accuracy of the readings. The State objects to this proposal as unnecessary and burdensome, arguing that its current program of annual calibration is sufficient.
Defendants, on the other hand, raise several challenges to this EC algorithm, both in theory and in practice. First, they argue that it demonstrates that Draeger's claim that the device uses two completely independent measurements for breath alcohol is false. Second, they argue that it demonstrates that the device is simply not accurate in any sense. Third, they argue that the algorithm, which they attack as having been hidden from them throughout the initial remand proceedings, is evidence that the software may be utilizing other hidden mechanisms that might inflate readings so that the accuracy of the results can never be reliable.
[Id. at 121-23, 943 A.2d 114.]
The Court did not adopt the position espoused by either party, but instead adopted the Special Master's recommendation that the recalibration protocol be changed to require semiannual-recalibration.
We do not share either the State's or defendants' concerns. The record reflects that a semi-annual inspection and recalibration program recommended by the Special Master is consistent with the manufacturer's recommendations. At the same time, it provides a useful safeguard by affording a more regular opportunity to evaluate and replace aging fuel cells. We discern no reason to permit the State to continue to adhere to its program of annual recalibration, particularly in light of the concerns raised as to the utilization of a compensating algorithm in the interim.
[Id. at 123, 943 A.2d 114 (emphasis added).]
Nevertheless, the Court expressed confidence in the overall accuracy of the EC algorithm itself.
However, we do not find merit in defendants' concerns about the EC algorithm or its use. There is sound scientific evidence that supports the conclusion that fuel cells begin to age as soon as they are put into service and that fuel cell drift is inevitable. But there is equally ample support for the proposition that even as the intensity of the peak demonstrated by the EC evaluation of the sample diminishes over time, the reactive effect overall (that is, the area under the curve being calculated) does not. Instead, the time within which the test is performed simply truncates the EC reading before all of the otherwise appropriate data can be generated. Theoretically, one could, perhaps, program the machine to calculate the missing area based on a presumed regularly-shaped curve. Although that might even be a more accurate method of supplying the missing data, it would not, in the end, be as advantageous to defendants as is the minor upward adjustment that the algorithm effects. Indeed, because the device will not generate a result that can be utilized if the *527 readings are out of tolerance, the algorithm alters the EC result in an amount that, we are confident, cannot fairly be seen as convicting the innocent.

[Id. at 123-24, 943 A.2d 114 (emphasis added).]
Pollock argues that the language of the Supreme Court's opinion in Chun compels a retroactive application of the semiannual-recalibration requirement. We disagree.
In the order that accompanied the decision, id. at 149-54, 943 A.2d 114, the Court outlined parameters for the use of AIR reports in pending cases and also the steps to be taken going forward. Paragraph 1 of the order outlines specific parameters for the use of existing AIR reports. For example, there are different requirements depending upon whether the AIR report was based on the testing of two or three breath samples and if the defendant was a woman over the age of 60 when the test was administered. Id. at 150-51, 943 A.2d 114. There is, however, no reference in Paragraph 1 to the recalibration issue and no specific bar to the use of AIR reports issued by machines that had been recalibrated more than six months prior to the date of the test. We believe that the Court would have articulated such a prohibition explicitly had that been its intention.
Paragraphs 2 and 3, in contrast, set forth a number of actions to be taken by the State "forthwith" in order to implement the Court's directions for the future, including changes to the firmware and new discovery requirements. Id. at 151-53, 943 A.2d 114. In Paragraph 3.A, the Court required the State to "forthwith" "[c]ommence inspection and recalibration of all Alcotest devices every six months in place of the current annual inspection and recalibration program." Id. at 153, 943 A.2d 114. The use of "commence" in the order is consistent with the Court's language in the body of the opinion that it could "discern no reason to permit the State to continue to adhere to its program of annual recalibration." Id. at 123, 943 A.2d 114 (emphasis added).
We conclude from our reading of the text of the Chun opinion and order that the Court intended the semiannual-recalibration requirement to apply prospectively only, and that AIR reports from tests administered prior to Chun are admissible as long as the Alcotest machine had been recalibrated in conformity with the then existing annual requirement.[5]

III
Consequently, the AIR report resulting from Pollock's test on a machine that had been recalibrated in compliance with the State's then existing annual protocol was admissible against him. We therefore affirm his conviction by the Law Division.
Affirmed.
NOTES
[1] As discussed at greater length in Chun, supra, 194 N.J. at 83, 943 A.2d 114, the Alcotest machine performs several tests and reports the lowest blood alcohol score on the AIR.
[2] In Chun, supra, 194 N.J. at 84, 943 A.2d 114, the Court described "calibration" as "attaching the machine to an external simulator which uses a variety of solutions of known alcohol concentrations to create vapors that approximate human breath" and "analyzing the device's ability to identify accurately each of those samples within the acceptable range of tolerance" to "ensure that the machine is correctly calibrated."
[3] We find no indication in the record that the stay was extended by the trial court or that a further stay was sought from this court.
[4] Draeger Safety Diagnostics Inc. is the manufacturer of the Alcotest machine. Chun, supra, 194 N.J. at 66, 943 A.2d 114.
[5] Pollock also argues that the principles generally used to determine whether a new rule in criminal law is to be applied retroactively mandate that the semiannual-recalibration requirement be applied to prohibit the use of the AIR report in his case. In light of our conclusion about the language of the Chun opinion itself, we need not consider general principles of retroactivity.