27 A.3d 1212 (2011)
422 N.J. Super. 185
STATE of New Jersey, Plaintiff-Appellant,
v.
Nicole HOLLAND, Defendant-Respondent.
State of New Jersey, Plaintiff-Respondent,
v.
Kenneth Pizzo, Jr., Defendant-Appellant.
Nos. A-4384-09T3, A-4775-09T3.
Superior Court of New Jersey, Appellate Division.
Argued February 8, 2011.
Decided April 5, 2011.
*1213 Monica do Outeiro, Assistant Prosecutor, argued the cause for State of New Jersey, appellant in Docket No. A-4384-09T3 *1214 and respondent in Docket No. A-4775-09T3 (Peter E. Warshaw, Jr., Monmouth County Prosecutor, attorney; Ms. Outeiro, of counsel and on the brief).
John Menzel, Point Pleasant, argued the cause for appellant Kenneth Pizzo, Jr.
Alexander M. Iler, Red Bank, argued the cause for respondent Nicole Holland (Law Offices of Alexander M. Iler, attorneys; Robert W. Ruggieri, of counsel; Mr. Iler, on the brief).
Before Judges PARRILLO, YANNOTTI and SKILLMAN.
The opinion of the court was delivered by
PARRILLO, P.J.A.D.
We granted leave to appeal in these two matters, consolidated for the purposes of this opinion, to resolve a common issue: whether blood alcohol concentration (BAC) results derived from an Alcotest 7110 MKIII-C (Alcotest) breath-testing device are admissible against defendants in driving while intoxicated (DWI) prosecutions when the device has been calibrated with a Control Company, Inc. (Control Company) temperature probe, or thermometer, instead of the Ertco-Hart temperature probe referenced in State v. Chun, 194 N.J. 54, 89, 135, 152-53, 943 A.2d 114, cert. denied, 555 U.S. 825, 129 S.Ct. 158, 172 L.Ed.2d 41 (2008).
Defendants Nicole Holland and Kenneth Pizzo were convicted in the municipal courts of Neptune City and Sea Girt, respectively, of per se violations of N.J.S.A. 39:4-50, among other motor vehicle offenses. Holland had moved to exclude the results of the Alcotest used to measure her BAC at 0.16% because the Alcotest was calibrated with a temperature probe manufactured by a company other than Ertco-Hart. In the other matter, in anticipation of a similar motion, Pizzo requested a N.J.R.E. 104 hearing on the State's foundational proofsspecifically the various reports relating to calibration of the Alcotest machine, and further requested that the State provide missing documentation on the Alcotest device, which in his case produced a BAC reading of .15%. In both instances, the municipal court judge denied the motions, concluding in Holland's case that the Chun decision mandates the use of a NIST traceable thermometer and not necessarily one manufactured by Ertco-Hart, and in Pizzo's case that the State had complied with Chun's requirements. Holland subsequently entered a conditional guilty plea to DWI and Pizzo was convicted after a bench trial of a per se violation of N.J.S.A. 39:4-50.
Both defendants appealed their municipal court convictions to the Law Division, where de novo reviews were conducted by different judges. In the Holland matter, the judge suppressed the Alcotest results for failure to provide a Draeger Safety, Ertco-Hart Digital Temperature Measuring System Report of Calibration, NIST traceability as a requisite foundational document, and remanded the matter to municipal court for proceedings limited to observational proof of Holland's alleged intoxication. The Law Division judge further ruled that, before the State could use a temperature probe manufactured by a company other than Ertco-Hart, it was required to seek permission from the Supreme Court and submit proof of comparability in a Frye[1] hearing.
The judge in the Pizzo matter reached the opposite conclusion, rejecting the defendant's argument that the Alcotest results were inadmissible solely because the State used a Control Company temperature *1215 probe, but remanded to the municipal court to conduct a N.J.R.E. 104 hearing on the State's failure to produce additional Alcotest device data previously requested by Pizzo and to determine whether the Control Company temperature probe was comparable to the Ertco-Hart probe.
We granted leave to appeal in both cases in the interest of justice. R. 2:2-4. However, before addressing the common issue raised in the State's and defendant Pizzo's appeals, we first review basic concepts regarding admissibility of Alcotest results as set forth in Chun, and the role of the NIST traceable temperature measuring system in calibrating a particular Alcotest device.
It has long been recognized that breath-testing devices, known as breathalyzers, are scientifically reliable and accurate instruments used for determining BAC. Chun, supra, 194 N.J. at 64, 943 A.2d 114. In fact, drivers whose breathalyzer test results exceed the statutory maximum BAC limit are guilty per se of DWI. Ibid. In order to admit the breathalyzer test results into evidence, the Court has required foundational proofs relating to the operation of the breathalyzer machine. Ibid. Over the years, the breathalyzer has become technologically outdated, resulting in the introduction of the Alcotest. Ibid. The Alcotest generates an Alcohol Influence Report (AIR), which provides an individual's BAC. Id. at 79, 82-83, 943 A.2d 114. The Alcotest is manufactured and marketed by Draeger Safety Diagnostics, Inc. (Draeger). Id. at 66, 943 A.2d 114.
Chun held that the novel Alcotest, utilizing New Jersey Firmware version 3.11, is "generally scientifically reliable," subject to certain conditions established by the Court. Id. at 65, 943 A.2d 114. Thus, "as a precondition for admissibility of the results of a breathalyzer, the State [is] required to establish that: (1) the device was in working order and had been inspected according to procedure; (2) the operator was certified; and (3) the test was administered according to official procedure." Id. at 134, 943 A.2d 114. The State must "clearly establish" these preconditions to admissibility. Id. at 92, 943 A.2d 114.
Having deemed the instrument reliable in general, the Court then explained how to determine whether the device was in "proper working order" in a particular case. Id. at 154, 943 A.2d 114. To that end, the State must enter into evidence three core foundational documents, none of which pertain to the temperature measuring device at issue here:
(1) the most recent Calibration Report prior to a defendant's test, including control tests, linearity tests, and the credentials of the coordinator who performed the calibration; (2) the most recent New Standard Solution Report prior to a defendant's test; and (3) the Certificate of Analysis of the 0.10 Simulator Solution used in a defendant's control tests.
[Ibid.]
Calibration of the Alcotest during installation, and periodic re-calibration to ensure good working order, is a core element of proof in the accuracy determination, id. at 134, 153, 943 A.2d 114, and thus the Chun Court has required introduction of the most recent calibration report prior to admitting Alcotest results into evidence. Id. at 142, 145, 943 A.2d 114.
Chun described the calibration process as follows:
Calibration of the machines involves attaching the machine to an external simulator which uses a variety of solutions of known alcohol concentrations to create vapors that approximate human *1216 breath. By exposing the ... mechanisms to these differing concentrations, and by analyzing the device's ability to identify accurately each of those samples within the acceptable range of tolerance, referred to as a linearity test, the coordinator is able to ensure that the machine is correctly calibrated.
[Id. at 84, 943 A.2d 114.]
In its description of the calibration process, the Court did not specifically consider the Ertco-Hart temperature probe. However, the Special Master explained the calibration process in greater detail, Findings and Conclusions of Remand Court, Feb. 13, 2007, reprinted in 2007 N.J. Lexis 39 (Special Master's Report), noting that "[t]o measure the temperature of the simulator solution, the [State Police] coordinator uses an Ertco-Hart digital NIST thermometer." Id. at 139.
Specifically, the calibration process involves the running of several sets of tests, which results in the printing of related reports: the Part I Control Tests, the Part II Linearity Tests, the Solution Change Report and the Calibration Record. Prior to commencing these tests, the testing coordinator will prepare several alcohol solutions. The first is a 0.10% alcohol solution for the control tests. Id. at 45. The others are 0.04%, 0.08% and 0.16% alcohol solutions for the linearity tests. Ibid. Each of these solutions must be heated to thirtyfour degrees Celsius (plus or minus 0.2 degrees), the average range of human breath, which will create vapors that approximate human breath and provide for successful calibration. Id. at 45, 286. To do so, the coordinator will allow each solution to heat for approximately one hour and then ensure that they have reached the appropriate temperature using an external NIST traceable temperature probe.[2]Id. at 45, 138-39. Thus, the temperature probe is used to ensure the appropriate temperature of the solutions prior to the commencement of calibration of the Alcotest machine. Id. at 45-46.
Once the coordinator has determined that the alcohol solutions have reached their appropriate temperatures, the coordinator will begin calibration. Again, neither the Ertco-Hart nor Control Company probe is a part of the Alcotest deviceit is used only to determine the temperature of the solutions before they are put into the Alcotest machine.[3] First, the coordinator will gain access to the Alcotest with the coordinator's black key temperature probe and conduct a control test with the 0.10% simulator solution. Id. at 45, 138. If the results of this test are not within the requisite range, the Alcotest will prompt *1217 the coordinator to repeat the control test with a new 0.10% simulator solution. If, on the other hand, the results are acceptable, the Part I Control Test certificate is printed. This document records the temperature of the 0.10% simulator solution as measured during the testseparate from the temperature recorded by the coordinator with the Control Company, or Ertco-Hart, probe during pre-calibration preparations. Chun, supra, 194 N.J. at 105 n. 24, 943 A.2d 114.
The coordinator will then conduct two linearity tests on each of the three different simulator solutions of 0.04%, 0.08% and 0.16% by again using the coordinator's black key temperature probe. Special Master's Report, supra, at 45-46. If the results of the linearity tests are not acceptable, the Alcotest is placed out of service. If, on the other hand, the results are acceptable, the Part II Linearity Tests certificate is printed. Also contained on this certificate are the temperatures of the three solutions as measured during the testagain separate from that measured by either the Ertco-Hart or Control Company probe during pre-calibration preparations. Lastly, the coordinator uses a solution to generate a Solution Change Report, which will complete the calibration test sequence and print a calibration record. Id. at 46.
In order to enable a defendant to challenge the functionality or operability of the device, the State must also disclose in discovery, in addition to the three "core" documents admitted into evidence, certain other "foundational" documents, which "might reveal some possible flaw in the operation of the particular device." Chun, supra, 194 N.J. at 148, 943 A.2d 114. The twelve non-core foundational documents, some of which pertain to the accuracy of the temperature probes, consist of:
(1) Calibrating Unit, New Standard Solution Report, most recent change, and the operator's credentials of the officer who performed that change; (2) Certificate of Analysis 0.10 Percent Solution used in New Solution Report; (3) Draeger Safety Certificate of Accuracy Alcotest CU34 Simulator; (4) Draeger Safety Certificate of Accuracy Alcotest 7110 Temperature Probe; (5) Draeger Safety Certificate of Accuracy Alcotest 7110 Instrument (unless more relevant NJ Calibration Records (including both Parts I and II are offered)); (6) Calibration Check (including both control tests and linearity tests and the credentials of the operator/coordinator who performed the tests); (7) Certificate of Analysis 0.10 Percent Solution (used in Calibration-Control); (8) Certificate of Analysis 0.04, 0.08, and 0.16 Percent Solution (used in Calibration-Linearity); (9) Calibrating Unit, New Standard Solution Report, following Calibration; (10) Draeger Safety Certificate of Accuracy Alcotest CU34 Simulator for the three simulators used in the 0.04, 0.08, and 0.16 percent solutions when conducting the Calibration-Linearity tests; (11) Draeger Safety Certificate of Accuracy Alcotest 7110 Temperature Probe used in the Calibration tests; and (12) Draeger Safety, Ertco-Hart Digital Temperature Measuring System Report of Calibration, NIST traceability.
[Id. at 134-35, 153.]
These documents, including, most notably for present purposes, the Draeger Safety, Ertco-Hart Digital Temperature Measuring System Report of Calibration, NIST traceability[4] "are not fundamentally *1218 a part of demonstrating that the particular device was in good working order." Id. at 144-45. Characterized as "tests of tests and, therefore ... too attenuated[,]" they are not essential to establish admissibility. Id. at 144. Rather, they are produced in discovery to allow a defendant to challenge the "accuracy of the device used and the chemical composition of solutions used to routinely test and calibrate the machine." Id. at 142, 144 n. 47. To that end:

[I]n the event that any defendant perceives of an irregularity in any of these documents that might affect the proper operation of the device in question, timely issuance of a subpoena will suffice for purposes of protecting that defendant's rights. Were the use of the subpoena power to become routine, we would commend to the parties, with the assistance of our municipal courts, the use of pretrial de bene esse depositions or video conferencing technology to reduce the burden on the State or any independent testing laboratories.
[Id. at 144 n. 47 (emphasis added).]
However, "[a]bsent a pre-trial challenge to the admissibility of the AIR based on one of the other foundational documents produced in discovery, [the Court] perceive[d] of no reason to require that they be made a part of the record routinely." Id. at 145.
The present issue arises because testing coordinators in these two matters used a Control Company probe to confirm the appropriate temperature of the alcohol solutions, rather than the Ertco-Hart device referred to in Chun.[5] Thus, in both cases, instead of producing in discovery a "Draeger Safety Ertco-Hart Calibration Report" as set forth in an order appended to the Chun opinion, the State produced a Control Company "Traceable Certificate of Calibration for Digital Thermometer," which is the manufacturer's own certification of the measuring system's accuracy. Consequently, both defendants argued that the results rendered by the Alcotest machine in their respective cases should have been excluded because a condition established in the Chun order was not satisfied. The Law Division judge in the Holland matter agreed, concluding that only Draeger's Ertco-Hart Calibration reporta non-core documentcould satisfy the Chun Court's foundational requirements for admission of Alcotest results. We disagree. In our view, the AIR is not rendered inadmissible as an automatic consequence of the State's failure to produce a non-core foundational document.
Granted, the Chun Court mentioned "Ertco-Hart" several times in requiring foundational documents identifying the temperature probe by serial number in the calibration reports, inclusion of that serial number in the firmware of the temperature measuring system, and production of the temperature probe's NIST traceable certification.[6] We do not read these references *1219 too strictly or literally as a mandate that only the Ertco-Hart device be used, but rather as a facile means of identifying the temperature probe used to calibrate the Alcotest machine in Chun, and as distinguished from the other thermometers employed in the calibration process.
Nowhere in Chun or its accompanying order did the Court expressly state that only the Ertco-Hart device, to the exclusion of all others, was acceptable. On the contrary, the Chun Court adopted as modified the Special Master's Report, which described the calibration process as involving a "NIST-traceable temperature probe monitor[ing] the temperature of the simulator solution." Special Master's Report, supra, at 45 (emphasis added). Indeed, the Special Master advised the Court that "[t]he revised firmware shall require that the Ertco-Hart Digital Temperature Measuring System or other similar devices traceable to the National Institute of Standards and Technology is in proper operating condition and that the serial number of such devices be listed on all reports where ... relevant." Id. at 272. (emphasis added).
There is no discussion in Chun of the uniqueness or significance of Ertco-Hart as the manufacturer of the temperature probe, and its only discernable characteristic appears to be certification of NIST traceability, which the Control Company probe also possesses. In other words, the emphasis is on NIST traceability as opposed to brand name. See ibid. Thus, we conclude that the Ertco-Hart references in Chun are merely identifiers explaining the necessary firmware modifications and foundational documents required with respect to one temperature probe (the one used to determine the alcohol solution temperatures during the calibration process), separate and apart from the Alcotest machine's internal temperature probe and the coordinator's black key probe.
We have in the past embraced a practical application of the requirements for admission of breath-test results so as not to "create an unduly and ... unintended restriction on the State's ability to prosecute DWI cases." State v. Ugrovics, 410 N.J. Super. 482, 488-89, 982 A.2d 1211 (App.Div.2009), certif. denied, 202 N.J. 346, 997 A.2d 231 (2010). There, the defendant claimed that the Court's use of the term "operator" in Chun prohibited any individual other than a certified Alcotest operator from observing a driver during a required "observation" period. Id. at 488-90, 982 A. 2d 1211. We disagreed, rejecting "a literal, unexamined application of such language [that] would create an unduly and ... unintended restriction on the State's ability to prosecute DWI cases based on the results of an Alcotest." Id. at 489, 982 A.2d 1211.
Courts have also rejected limiting BAC results to those obtained using specifically manufactured machines. See State v. Samarel, 231 N.J.Super. 134, 140, 555 A.2d 40 (App.Div.1989). In Romano v. Kimmelman, 96 N.J. 66, 474 A.2d 1 (1984), the Court upheld the reliability of the "Smith and Wesson Breathalyzer Model 900." Id. *1220 at 72, 82, 474 A.2d 1. Later, after the State began to replace the Smith and Wesson with a Draeger Breathalyzer Model 900, a driver charged with DWI challenged the driver's BAC results obtained using the Draeger breathalyzer machine because it was not manufactured by Smith and Wesson as referred to by the Romano Court. Samarel, supra, 231 N.J.Super. at 140, 555 A.2d 40. There, we rejected the "defendant's argument that the Supreme Court has approved the use of Smith and Wesson's breathalyzer model 900 to the exclusion of other manufacturers' breathalyzer models 900." Ibid. Similarly, in State v. Laurick, 231 N.J.Super. 464, 555 A.2d 1133 (App.Div.1989) rev'd on other grounds, 120 N.J. 1, 575 A.2d 1340, cert. denied, 498 U.S. 967, 111 S.Ct. 429, 112 L.Ed.2d 413 (1990), we held that the Romano Court did not intend to limit its reliability findings to specific breathalyzer manufactures because such a reading of Romano would create "an absurd result." Id. at 471 n. 1, 472-73, 555 A.2d 1133.
Because the use of another manufacturer's temperature probe to calibrate the Alcotest machine does not alone compel exclusion of test results, we reverse the contrary finding of the Law Division judge in the Holland matter. Of course, the fact that the Alcotest results are not rendered automatically inadmissible thereby does not end the inquiry. Although the Alcotest machine has been found to be generally reliable, the State still bears the burden of demonstrating the "proper working order" of the device. As noted, this is accomplished by introducing into evidence the three core foundational documents, Chun, supra, 194 N.J. at 154, 943 A.2d 114, which the State had done in both the Holland and Pizzo matters. In other words, the State may meet its initial burden to support the admissibility of Alcotest results without reference to the calibration of the temperature probe. Thus, once the State has introduced the core documents into evidence and produced the other foundational documents in discovery, the burden of production shifts to the defendant to show why the machine was not in working order, namely, apropos to the present matters, whether and how the differences in the temperature probes had any impact at all. Absent further evidence in this regard, we discern no impediment to the admission of the Alcotest results as the State would have satisfied its ultimate burden of persuasion as to the device's reliability and accuracy.
Based on the foundational document itself, Holland raised sufficient questions as to the reliability of the Control Company's probe to warrant further inquiry. Specifically, the device was calibrated on May 26, 2009, by a State Police coordinator using a Control Company temperature probe with a serial number DDXAP2-149. During discovery, the State provided the Control Company Traceable Certificate of Calibration for Digital Thermometer as a foundational document, demonstrating the reliability of the temperature probe. However, contained on this certification are numerous serial numbers and "due dates," including a March 6, 2009 due date for temperature probe serial number 149. Although unexplained, the due date may possibly be the date the probe is due for re-certification.
Holland raised this issue in the municipal court, contending that the certification and calibration reports revealed that during the May 26, 2009 calibration, the testing coordinator used an expired temperature probe, which came due for re-certification on March 6, 2009. However, the parties could not explain with certainty the use of the phrase "due date," nor the existence of a November 18, 2008 "Cal Date" and November 18, 2010 "Cal Due." Relying on those entries, however, Holland interpreted the Control Company calibration certificate to require calibration *1221 of its temperature probe every two years. Nevertheless, the municipal court could not determine whether the certificate's "Cal Date: 11/18/08" and "Cal Due: 11/18/10" was applicable to the temperature probe, or the due date of March 6, 2009 for serial number 149 rendered it unreliable.[7] Later, on appeal to the Law Division, Holland raised the issue again, asserting that there were "some questions about what certain terms meant on [the] calibration certificate . . . [a]nd certain dates."
Satisfied that the Alcotest results were automatically excluded by reason alone of the difference in manufacturer, the Law Division judge left the questions raised by defendant unanswered. Yet, as part of its ultimate burden to clearly establish the good working order of the device, the onus of explaining any facial irregularity in the foundational documents that might affect the proper operation of the device in question lay with the State. Chun, supra, 194 N.J. at 92, 144 n. 47, 943 A.2d 114. Therefore, we are constrained to remand to the Law Division to determine, among other issues validly raised by defendant Holland,[8] whether the Control Company temperature probe was properly certified on May 26, 2009, pursuant to the Traceable Certificate of Calibration for Digital Thermometer.
We reach the same result, as did the other Law Division judge, in the Pizzo matter. There, the court found that although Chun did not preclude the use of any similar digital thermometer traceable to NIST, "the record below is insufficient to support a finding that the digital thermometer used in this matter was in fact comparable to the Ertco-Hart thermometer." Consequently, the judge remanded the case to the municipal court for a N.J.R.E. 104 hearing on the reliability of the Control Company temperature probe and, separately, on a discovery issue involving missing Alcotest machine data not produced by the State and previously raised by the defendant below. The State did not cross-appeal from that remand order. In fact, the State has represented that it will be able to demonstrate that its change of manufacturer "holds no significance" *1222 and that "the Control Company, Inc., temperature probe is comparable to its Ertco-Hart-manufactured counterpart and meets the Special Master's requirement of traceability to internationally-recognized NIST standards."
We, therefore, agree for reasons previously stated with regard to the Holland matter that a remand is also indicated as to defendant Pizzo. We direct, however, that these two matters be consolidated and remanded to the Law Division for a hearing before a single judge to be designated by the Assignment Judge of Monmouth County to establish the reliability of the Alcotest results and the validity of the Traceable Certificate of Calibration for Digital Thermometer at the time of the Alcotest's calibration in each case. We further direct that the hearing is to be conducted within sixty days, with notice to the Attorney General, and findings of fact and conclusions of law rendered forthwith thereafter. We retain jurisdiction.
NOTES
[1] Frye v. United States, 293 F. 1013 (D.C.Cir. 1923).
[2] NIST refers to the National Institute of Standards and Technology, which is responsible for establishing, maintaining and publishing basic standards of measurement consistent with their international counterparts. Special Master's Report, supra, at 45.
[3] Significant for present purposes, there are other temperature probes, distinct from the temperature measuring devicewhether made by Ertco-Hart or Control Company used by the coordinator in initial calibration, see Special Master's Report, supra, at 138-39, that are integral to the calibration process itself and are not here in issue. One such probe is the "black key temperature probe" used by the testing coordinator to gain access to the calibration process. Id. at 138; see also Chun, supra, 194 N.J. at 83, 943 A.2d 114. Additionally, the Alcotest device itself contains a temperature probe within the machine. Special Master's Report, supra, at 35; Chun, supra, 194 N.J. at 105 n. 24, 943 A.2d 114 ("There are several temperature devices related to the Alcotest. One, which is an integral part of each device, and the report of which is included on the AIR, heats the simulator solution in the control test both in the device and, by extension, in the calibration process. Another heats the breath tube, but not the subject's actual breath sample, to prevent condensation.").
[4] Specifically, the Chun Court requires that a State Police coordinator re-calibrate the Alcotest device once every six months as evidenced by a "Draeger Safety, Ertco-Hart Calibration Report," certifying the reliability of the temperature probe, which must be produced during discovery as one of numerous foundational documents prior to admission of the Alcotest results. Id. at 153.
[5] In Holland's case, the Alcotest 7110 MKIII-C was successfully calibrated on May 26, 2009 by a certified State Police Breath Test Coordinator, and produced a BAC reading of 0.16% on June 24, 2009. As for Pizzo, the Alcotest 7110 MKIII-C was successfully calibrated on March 6, 2009 by a certified State Police Breath Test Coordinator, and produced a BAC reading of 0.15% on May 25, 2009.
[6] Specifically, there are four such references:

[T]he parties agree ... that future calibration, certification and linearity reports should include the serial number of the Ertco-Hart digital temperature measuring system utilized in performing those testing and maintenance operations (Special Master's Finding 2(i)).
... [T]he Special Master recommended that certain documents, which he referred to as the "foundational documents," be produced during discovery and that they be admitted into evidence as part of the State's case-in-chief. The documents in question can be described as follows: ... (12) Draeger Safety, Ertco-Hart Digital Temperature Measuring System Report of Calibration, NIST traceability.
G. The firmware shall be programmed to include the serial number of the Ertco-Hart digital temperature measuring system utilized as a part of each calibration, certification and linearity report;
3. ORDERED that the State shall forthwith... [p]roduce in discovery the twelve foundation documents identified by the Special Master as follows: ... (12) Draeger Safety Ertco-Hart Calibration Report. [Chun, supra, 194 N.J. at 89, 134-35, 152-53, 943 A.2d 114 (emphasis added).]
[7] Pursuant to Chun's direction that "in the event that any defendant perceives of an irregularity in any of [the foundational] documents that might affect the proper operation of the device in question, timely issuance of a subpoena will suffice for purposes of protecting that defendant's rights[,]" Chun, supra, 194 N.J. at 144, 943 A.2d 114, the municipal court judge granted an adjournment so that Holland could depose Wallace Berry, the technical manager at Control Company whose signature appears on the certificate. Prior to the next hearing, Holland subpoenaed Berry for a video deposition, but Control Company, a Texas corporation, declined to produce Berry for the deposition. The municipal court judge ultimately determined that he was unable to assert jurisdiction over Berry to compel Berry's appearance as an out-of-state witness.
[8] The trial judge cited other differences between the Ertco-Hart Digital Temperature Measuring System Report of Calibration, NIST traceability and the Control Company Traceable Certificate of Calibration for Digital Thermometer:

In fact, the evidence before this court shows that there are differences between the two temperature probes. First, Control Company, Inc. requires that the temperature probe be tested every two years, while the Draeger Safety temperature probe requires testing every twelve months. Second, the certificate from the Control Company states the following: ". . . there is no exact way to determine how long calibration will be maintained." However, the Draeger Safety certification for the digital temperature probe does not contain this language. This court finds that the differences stated above in conjunction with the fact that there was no expert testimony regarding its functionality, leaves this court to question whether this device can properly test the operating capability of the Alcotest machine.